## OLIVIER et al. v. MT. UNION TANNING & EXTRACT CO.

(Circuit Court of Appeals, Third Circuit. February 12, 1920. On Petition for Limited Rehearing and on Motion for Entry of Final Judgment. May 11, 1920.)

No. 2497.

1. **Sales ⟨key⟩17—Party obligating itself jointly for payment of property purchased held not a joint purchaser and to have no title.**

Where defendant, having a contract with a chemical company to manufacture extracts from logwood furnished by the chemical company, and to sell extracts manufactured from its own logwood through the chemical company, wired and wrote a seller of logwood to the chemical company that it would be jointly responsible and jointly obligated itself to pay for such logwood, this constituted a guaranty of payment, and not an offer to purchase the wood jointly, and it acquired no title, where the seller invoiced the logwood to the chemical company, and defendant never paid or offered to pay its share, and, in refusing to surrender possession, did so on the ground that it was being asked to pay, especially where, for over 14 months after receiving notice of the claim of plaintiffs under assignments from the chemical company, it asserted no title, and repeatedly recognized plaintiffs' title.

2. **Appeal and error ⟨key⟩1176(1)—On reversal of judgment for plaintiff for an insufficient amount, rendition of judgment denied.**

Where, in replevin, plaintiff recovered judgment for the value of 91 tons of logwood, but was denied judgment as to 815 tons, on the ground that defendant was a joint owner with plaintiff, the court will not, in reversing the judgment on plaintiff's writ of error, direct modification of judgment to include the value of the 815 tons at the rate fixed for the 91 tons, without allowing defendant to be heard on the question where, though defendant did not appeal, it excepted to the findings and disputed findings on which such judgment would have to be based.

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On Petition for Limited Rehearing and on Motion for Entry of Final Judgment.

3. **Appeal and error** ⊜⊐1176(4)—**On reversal court may direct judgment required by pleadings and special findings.**

On reversal of a judgment entered in a case tried by the court without a jury, the Circuit Court of Appeals may direct such judgment to be entered as the pleadings and special finding of facts of the court below require.

4. **Assignments** ⊜⊐98—**Assignee of logwood not entitled to value from party manufacturing extract therefrom before notice of assignment.**

Defendant, manufacturing extract under a contract with a chemical company from logwood furnished by the company, was not liable to plaintiffs, who made advances to such company and took assignments of the logwood as collateral security, for any logwood which it manufactured into extract prior to notice of plaintiff's claim, and the extract from which was delivered by it to the chemical company.

5. **Appeal and error** ⊜⊐1177(6)—**New trial not granted on issue actually found by court, but on which no express finding was made.**

In replevin to recover logwood or its value, the court, on reversal of a judgment denying a recovery as to certain logwood, will not grant a new trial because of defendant's claim that the logwood was manufactured and the extract delivered to plaintiff's assignor before notice of the assignment, where the court clearly found on ample evidence against such claim, though it made no express finding, because its conclusion on another point made it unnecessary.

In Error to the District Court of the United States, for the Middle District of Pennsylvania; Charles B. Witmer, Judge.

Action by Marcel Olivier and others, copartners as Olivier & Co., against the Mt. Union Tanning & Extract Company. Judgment for plaintiffs for an insufficient amount (253 Fed. 593), and they bring error. Reversed, on rehearing, with directions to modify judgment.

John R. Geyer and John E. Fox, both of Harrisburg, Pa., for plaintiffs in error.

H. H. Waite and James S. Woods, both of Huntingdon, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

HAIGHT, Circuit Judge. This case was tried without a jury, pursuant to sections 649 and 700 of the Revised Statutes (Comp. St. §§ 1587, 1668), and resulted in a judgment in favor of the plaintiffs in error (the plaintiffs below), who nevertheless prosecute this writ of error, because the court below did not award them all the relief that they sought. The action was in replevin, to recover approximately 1,576 tons of logwood, of which the plaintiffs claimed to be the owners, or at least entitled to its possession. The marshal was able to find, and seized by virtue of the writ, only 815 tons, which, however, the court below determined was the equivalent of 670 tons in the condition in which it originally came into the possession of the defendant.

⊜⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It was held that 91 tons had been eloigned, and a money judgment for the value thereof was awarded to the plaintiffs, as well as the right to the possession of the 815 tons. It was also decided that approximately 815 tons of the logwood claimed by the plaintiffs, which admittedly had also been eloigned, was owned jointly by the plaintiffs and the defendant, and hence that no judgment for its value could be entered in a replevin action. That ruling is the alleged error relied upon for the reversal of the judgment. It is contended that the trial court was not justified in finding that the plaintiffs and the defendant were the joint owners of the logwood in question, or, at any rate, that the defendant was in a position to assert such a title to defeat the plaintiffs' action pro tanto, and also that, even if the court was so justified, it should have awarded a money judgment to the plaintiffs for one-half of the value thereof.

It appears that in the latter part of April, 1916, the defendant (which will hereinafter sometimes be referred to as the Extract Company), and the Bothamley Chemical, Color & Extract Company, Incorporated (hereinafter referred to as the Chemical Company), entered into a verbal contract, which, on the 24th of May, 1916, was reduced to writing, whereby the Extract Company agreed to manufacture logwood extracts from logwood supplied by the Chemical Company, and the Chemical Company agreed to market or sell such extracts, as well as extracts made from logwood obtained by the Extract Company. The proceeds of such sales were first to be applied to the payment of the cost of the logwood material, freight thereon, and freight on the extract, and then to reimbursing the Extract Company for the cost of manufacture at the rate of 3 cents per pound of logwood extract. The profits, if any, were to be disposed of as follows: Those derived from the logwood supplied by the Chemical Company were to be divided equally between it and the Extract Company, as were also to be borne equally any losses which might be sustained, and the profits realized from the logwood supplied by the Extract Company were to be divided on the basis of 25 per cent. to the Chemical Company and 75 per cent. to the Extract Company.

Pursuant to this contract, the Chemical Company purchased various quantities of logwood, which it caused to be shipped to the Extract Company. The plaintiffs advanced, by payments direct to the vendors, the whole purchase price on some of these purchases, and took the Chemical Company's promissory notes, collateral in form, payable in three months from their respective dates. Each of such notes purported to assign and transfer, as collateral security for the payment of the notes, respectively, the logwood therein described. At the same time the plaintiffs took separate assignments, supplemental to the assignments contained in the notes and subject to the terms thereof, of all of the right, title, and interest of the Chemical Company in and to that particular logwood, and to any extract that might be made therefrom. Accompanying the notes and the assignments were the respective original invoices for the wood, together with the weight notes further describing it. Subsequently the Chemical Company delivered to the plaintiffs the several bills of lading consigning the re-

spective shipments to the defendant. As to all such logwood, with the exception of the 815-ton lot before mentioned, the trial court found that, as against the defendant, the title and the right to possession were in the plaintiffs, and judgment was entered accordingly. The propriety of the judgment to that extent is not here questioned by either party.

[1] The lot of 815 tons was purchased from H. Mann & Co., and was received by the defendant at its plant in June or July, 1916. The plaintiffs paid to the vendors of this lumber a little more than one-half of the purchase price thereof, and took from the Chemical Company, for the amount which they had so advanced, a note of the same tenor and character as those before mentioned, and also received the same additional instruments as they received when making the other advances. The trial court held that the plaintiffs were thus vested with all the right, title, and interest of the Chemical Company in and to that particular lot of logwood, but that such interest or title was, as before stated, joint with the Extract Company, because the logwood had been purchased by it and the Chemical Company jointly. The only evidence to support that finding, and indeed the only evidence relied upon by the defendant, consists of the following telegram and confirmatory letter which the defendant sent to the vendors before, apparently, the logwood arrived in this country:

"11:15 A. M. Mt. Union, April 27, 1916.
"To H. Mann & Co., Produce Exchange Bldg., N. Y. City, N. Y.
"We will be jointly responsible with Bothamley Chem. Co. for twenty-eight hundred tons logwood recently bought shipment here.
"Mt. Union Tanning & Extract Co."

"April 29, 1916.
"H. Mann & Co., Produce Exchange Bldg., New York City—Gentlemen: Supplementing our telegram, copy which was sent you yesterday, we beg to advise that we will jointly obligate ourselves for the payment of the 2,800 tons of Logwood to be delivered in May, June, July, or August at $75 per ton, net cash, ex dock New York, which the Bothamley Chemical Co. have arranged with you to come up on schooners Fred A. Davenport, Perry Setser, Calhoun E. Ross, and Wiley, which wood is to be shipped us here.
"Yours very truly,        Mt. Union Tanning & Extract Co."

The 815 tons in question were imported on the schooner Davenport. The defendant's theory is that the telegram and letter constituted an offer to purchase the logwood jointly with the Chemical Company, and presumably, that it was accepted by the vendor, as well as the Chemical Company. We think that the two writings are not, on their face, susceptible of such a construction as the defendant seeks to deduce from them, but rather that they were merely offers on the part of the latter to become a guarantor for the payment of the purchase price. The telegram refers to "logwood recently bought." There is no evidence whatever to show that any of this logwood had been bought or purchased by any one other than the Chemical Company. Indeed, if it had been previously purchased by the Extract Company, either separately or jointly, the telegram would have been unnecessary and superfluous. Moreover, the letter refers to logwood "which the Bothamley Chemical Co. have arranged with you to come up on the

schooners," etc. The expressions, "we will be jointly responsible," and "we will jointly obligate ourselves for the payment," taken in connection with the other quoted expressions, clearly import an intention to guarantee the payment of the purchase price rather than to purchase the wood. But, in addition to this, the vendors invoiced the logwood to the Chemical Company alone, from whom it received upon delivery, through the plaintiffs, more than one-half of the purchase price. It is thus apparent that the vendors did not understand the telegram and letter as an offer of the Extract Company to become joint purchasers of this logwood, or, if they did, that they did not accept it.

Nor is there any evidence to show that the Chemical Company, in any of its dealings with the plaintiffs, the vendors, or the Extract Company, indicated in any way that it was not the sole and exclusive owner of the logwood. But if the telegram and letter, so far as the legal relation which the defendant sought to thereby create, may be considered ambiguous, so that extrinsic evidence may be resorted to to ascertain the meaning thereof, the record furnishes abundant evidence from which the only legitimate inference is that the defendant never considered that it was the joint owner of this logwood until this suit was brought, some 15 months after the plaintiffs notified it of their claim thereto, and then apparently only because a claim had been made, presumably by Mann & Co., upon it for the part of the purchase price which remained unpaid; the Chemical Company having in the meanwhile become bankrupt. The Extract Company never paid, nor, as far as the evidence discloses, ever offered to pay, any part of the balance of the purchase price. In the early part of October, 1916, shortly after the collateral notes became due and were not paid, the plaintiffs, through their agents, the Bankers' Trust Company of New York, notified the defendant of their claim to ownership of all of the logwood pledged or assigned as before stated, giving to the defendant a complete list of the dates of shipment, the car numbers, and weights. In this list was included the 815 tons in question.

Not only did the defendant then fail to assert its claim of title to any part of the logwood so assigned, but it repeatedly, in correspondence, referred to it as the property of the plaintiffs, entered into arrangements with the plaintiffs for manufacturing the same upon the terms and conditions of the original contract between it and the Chemical Company, including a 50 per cent. division of profits, although, if it had purchased the wood jointly with the Chemical Company, it would have been entitled to a larger share of the profits, assured the plaintiffs several times that it had not as yet manufactured "their" wood, permitted the plaintiffs to insure the same in their own name, without asserting any title thereto or interest therein, requested and accepted from the plaintiffs the moneys, amounting to a very considerable sum, which the defendant had originally expended for freight thereon, and on the expressed understanding by the plaintiffs that the wood belonged to them, acquiesced in the plaintiffs' decision to sell the logwood, and rescinded the contract to manufacture, when the market for extract became so low as to make it inadvisable to attempt to manufacture extract from the logwood, and not until 14 months

after it received notice of the plaintiffs' claim, and in response to the latter's notification that it had sold the logwood, did it ever dispute the plaintiffs' title or right to possession, and then only in the following manner:

"Other parties are claiming that this wood was sent to us, and they are demanding that we pay them for it. Until all these conflicting rights and claims are satisfactorily settled we must refuse to permit you or any other person to take this wood. We regret that we have to take his position, but in order to protect ourselves from liability we are compelled to do so."

It is difficult to conceive how it could have been more conclusively established that the defendant never intended, by the telegram and letter, to become a joint purchaser with the Chemical Company. The learned judge of the court below does not indicate in his opinion upon what he based his conclusion that there was a joint purchase, so we do not know whether it was on a construction of the telegram and letter, without the aid of extrinsic evidence, or, if he resorted to the extrinsic evidence, how he disposed of the effect of the evidence just above summarized. He did, however, specifically find that, prior to the time the plaintiffs sold the wood and arranged for its delivery, the defendant never questioned their title or right of possession, or the fact that their wood was in the defendant's possession, and that the defendant's only explanation of its action in representing to the plaintiffs that "their" wood was in the defendant's yards was that "it was made upon the position taken by the defendant that, if it had used any wood of the plaintiff, it would substitute some of its own in place of it, so that plaintiff would be protected."

A careful examination of the record reveals no explanation as to why defendant apparently acquiesced, for over a year, in the plaintiffs' assertion that they were the absolute owners of the logwood in question and permitted the plaintiffs to so deal with it, and as to why it never asserted, until suit was brought, that it claimed any title thereto. The only approach to an explanation is possibly found in the following answer made by the defendant's president, while being examined as a witness, when he was asked to explain letters written to the Bankers' Trust Company and the plaintiffs, viz.:

"There must be some way to indicate—I had to use some term to indicate—any wood which they might claim, and in my letter I would say 'your wood' and 'our wood.' We never denied, we never cast up the figures to see how much wood might be there, because Olivier & Co. had lots of logwood and extract in New York, and Mr. Peck [a representative of Olivier & Co.] didn't want us to ship any logwood extract until the market would recover."

Yet the same witness admitted that on October 3, 1916, he had received a memorandum of cars showing the wood that the plaintiffs claimed, and he further testified that, when the particular shipment of 815 tons came into the plaintiffs' plant in June of 1916, he ascertained from the Chemical Company that it had come from Mann & Co., and that he knew that the defendant was jointly interested in it. It also appears that the freight bills which the defendant paid, and for which it was afterwards reimbursed by the plaintiffs, contained a list of car numbers and weights, which, so far as the 815 tons are con-

cerned, were identical with the list thereof furnished to the defendant by the plaintiffs' agents in October, 1916. It is therefore apparent that the defendant had the information from which it could readily have ascertained that a part of the logwood, of which the plaintiffs were claiming to be the sole and exclusive owners, was the very logwood which the defendant now claims that it jointly purchased with the Chemical Company. The total purchase price of this logwood was $62,171.88, whereas the total purchase price of all the other logwood to which the plaintiffs laid claim was only $49,753.58. Hence it is inconceivable that the defendant did not know, when the plaintiffs first asserted their claim, that they were, in fact, claiming the 815 tons which had been purchased from Mann & Co.

But if, by any possibility, in the light of the foregoing facts, the learned judge of the court below considered that the defendant's action in failing to assert its claim, and in acquiescing in the plaintiffs' claim, was due to negligence (as is possibly suggested by the before quoted testimony of defendant's president), and hence that such action could not be considered as evidence that the defendant did not intend, by the letter and telegram, to become a joint purchaser, and if we are bound to accord to such a conclusion the same effect as we would to a verdict of a jury (as, of course, we would be, if it were based on a finding of fact which had evidence to support it), there would nevertheless be left the telegram and letter, which, as before stated, are not, in our judgment, sufficient in themselves to establish even an offer to purchase. The fact that Mann & Co. invoiced the logwood to the Chemical Company, and thus did not accept any such offer, if it was intended that one should be made, the fact that the Extract Company never paid or offered to pay for its share of the logwood, and the statement before quoted in its letter (which was written after it had become fully conversant with all the facts) as to the reason why it could not deliver possession of this particular logwood to the plaintiffs, or the person to whom they had sold it. We are accordingly forced to the conclusion that the defendant was not a joint owner of, and that it had no title to, the 815 tons of logwood, and that the learned trial judge was in error in holding to the contrary.

[2] It is asked on behalf of the plaintiffs that we direct that the judgment of the court below be so modified as to include the value, with interest, of the 815 tons, figured at the same rate as the court below adopted in fixing the value of the 91 tons which were found to have been eloigned. We do not feel that we should do so, even if we have the power, at this time, for two reasons, viz.:

(1) Aside from the question of ownership, the relative rights of the parties to this logwood are exactly the same as they are to the other logwood for which a money judgment was given; and although the correctness of the judgment as to the latter has not been questioned by either party in this court, exception was taken by the defendant in the court below to the findings upon which it was based. We therefore think that we should not preclude the defendant, if it desires to do so, from attempting to demonstrate, on this record if

possible, or on a new trial, that the judgment in respect to the latter logwood was erroneous. It may very well be that the defendant was content to waive its exceptions, and to accept the small money judgment which was entered against it, but would be unwilling to shoulder, without question, the very much larger judgment which would necessarily result, if the judgment of the court below, in respect to the 91 tons, is correct, from our decision that the 815 tons were not owned jointly by it and the plaintiffs.

(2) As the case was not submitted on an agreed state of facts, and as, in the court below, the defendant disputed some of the findings of fact upon which any judgment such as the plaintiffs seek would have to be based, we do not feel that we should attempt to decide whether we have the power (such as was exercised, for instance, in Ft. Scott v. Hickman, 112 U. S. 150, 164, 5 Sup. Ct. 56, 28 L. Ed. 636, and cases there cited, Rathbone v. Board of Commissioners, 83 Fed. 125, 132, 27 C. C. A. 477 [C. C. A. 8th Cir.], and U. S. v. Ill. Surety Co., 226 Fed. 653, 664, 141 C. C. A. 409 [C. C. A. 7th Cir.]), instead of merely reversing the judgment and ordering a new trial, to direct that it be modified, so as to include a money judgment for the 815 tons of logwood at the rate fixed by the trial court for the 91 tons which it found had been eloigned, without affording the defendant an opportunity to be heard thereon.

We will accordingly direct that the judgment be reversed and a new trial granted, but leave will be given to the plaintiffs to formally bring before us, within the time prescribed by the rules, by a petition or motion for a rehearing, the question as to whether this court may or should enter such a judgment as they seek.

### On Petition for Limited Rehearing and on Motion for Entry of Final Judgment.

[3] The plaintiffs have availed themselves of the permission granted in the opinion heretofore filed, and in the order made pursuant thereto, to move for a rehearing upon the question as to whether this court might or should direct the court below to so modify its judgment as to include the value of the 815 tons of logwood. The defendant has been heard in opposition thereto. The latter does not challenge or question our right to grant the plaintiffs' motion, but contends that we should not exercise the right, because it desires an opportunity to "recoup" in this action, the value of some 400 barrels of extract which it claims to have delivered to the Chemical Company, and which was in turn hypothecated by that company with the plaintiffs as security for a loan. We have no doubt that we have the power to direct such a judgment to be entered as the pleadings and the special finding of facts of the court below require. See, in addition to the cases cited in the opinion heretofore filed, Allen v. St. Louis Bank, 120 U. S. 20, 40, 7 Sup. Ct. 460, 30 L. Ed. 573; Cleveland Rolling Mill v. Rhodes, 121 U. S. 255, 264, 7 Sup. Ct. 882, 30 L. Ed. 920; Redfield v. Parks, 132 U. S. 239, 252, 10 Sup. Ct. 83, 33 L. Ed. 327.

[4, 5] As we understand the defendant's contention, it is that the

400 barrels of extract, which, as before mentioned, came into the possession of the plaintiffs, were manufactured from logwood covered by the assignments made by the Chemical Company to the plaintiffs. If this were so, the legal effect undoubtedly would be to reduce the defendant's liability, because the latter could not be held responsible in this action for any part of the logwood which it had manufactured into extract pursuant to the agreement between it and the Chemical Company, at least prior to the time that it received notice of the plaintiffs' claim to the logwood or the extract made therefrom. The same contention which the defendant now makes regarding these 400 barrels of extract, was presented in the pleadings in the court below. The decisive inquiry on this motion is therefore whether the court below made any finding of fact as to what logwood was used in manufacturing the 400 barrels of extract, and, if so, what it was. Although the learned trial judge, because of the conclusion which he reached regarding the ownership of the 815 tons of logwood, did not attempt to decide specifically whether any part of those 815 tons had been converted into extract and constituted part of the 400 barrels, yet it is entirely clear that he did find as a fact that none of the logwood covered by the plaintiffs' assignments was manufactured into extract pursuant to the contract with the Chemical Company or the subsequent agreement with the plaintiffs. That there was ample evidence to support such a finding is manifest, even if the admissions of the defendant's officers, both verbal and written, subsequent to the time the defendant was notified of the plaintiffs' claim, be alone considered. Manifestly, therefore, there would be no advantage in merely reversing the judgment and ordering a new trial in this case, because on a new trial the learned trial judge would undoubtedly make the same finding as he has heretofore made, and, as there is ample evidence to support such a finding, we would be unable to disturb it, even though we might not eventually agree with his conclusion of fact.

Accordingly, the court below will be directed to so modify its judgment as to include, in addition to the moneys therein awarded to the plaintiff, the value of the 815 tons of logwood figured at the same rate, both as to price and shrinkage, as that used by it in ascertaining the value of the 91 tons of logwood which it found had been eloigned, with interest from January 29, 1918. The plaintiffs are entitled to costs.