**HOWBERT v. PENROSE.**

**PENROSE v. HOWBERT.**

Nos. 1, 2.

Circuit Court of Appeals, Tenth Circuit.
Feb. 5, 1930.

COTTERAL, Circuit Judge, dissenting in part.

Henry McAllister, of Denver, Colo. (Clarence C. Hamlin, of Colorado Springs, Colo., on the brief), for plaintiff.

Ralph L. Carr, U. S. Atty., of Antonito, Colo. (C. M. Charest, General Counsel, Bureau of Internal Revenue, and Frederick W. Dewart, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for defendant.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The taxpayer, Spencer Penrose, sued the Collector of Internal Revenue to recover $85,799.04 income tax for the year 1918, paid by him under protest on July 1, 1924. A jury was waived in writing. The trial court heard the testimony, made findings of fact, and as a conclusion of law therefrom found that the plaintiff was entitled to recover $63,870.19 and interest, on account of the refusal of the government to allow a deduction for losses growing out of the sale of shares of stock in three copper companies —hereafter called the "copper stocks"; but denied the plaintiff relief on account of a loss

of $18,188.71 claimed as growing out of the sale of shares in The Granite Gold Mining Company, because of the failure of plaintiff to file a proper claim for refund. Both parties appeal. We will consider first the appeal of the Collector.

It seems that the plaintiff owned a large number of shares in the three copper companies which he acquired prior to 1913. He was one of the founders of the business, and he intended to keep these holdings as long as he lived. The certificates representing these shares were deposited for safekeeping with the Columbia Trust Company of New York City. In 1916 and 1917 he bought 2,000 additional shares in the Chino, 2,350 shares in the Ray Consolidated, and 1,000 shares in the Utah companies, on the market. For them he paid $268,981.25. The certificates representing these shares were delivered to the Columbia Trust Company, for safekeeping, and were commingled with the old certificates.

In 1918, plaintiff decided to sell the stock acquired in 1916 and 1917, one of the reasons being to enable him to deduct a loss in his 1918 return. He sold the exact number of shares purchased in 1916 and 1917, at an actual loss of $54,030.75. That such was the stock sold is evidenced by the books of his office, and also a pocket memorandum kept by himself. These sales were effected, as were the purchases, through the Colorado Springs office of a broker of the New York Stock Exchange. Delivery by the selling broker was effected by an order on the Columbia Trust Company. An employee of the trust company delivered, in most instances, certificates of the original stock owned by plaintiff, and not the certificates deposited in 1916 and 1917. The government declined to allow the loss incurred, but on the contrary charged plaintiff with a profit of $47,350.50, measured by the difference between the 1918 sale price and the 1913 value of the stock.

■ The trial court found as a fact from the evidence, that "plaintiff intended to and did sell" the shares acquired in 1916 and 1917. This finding is supported by the evidence, and cannot be disturbed. Dooley v. Pease, 180 U. S. 126, 21 S. Ct. 329, 45 L. Ed. 457; Stanley v. Supervisors of Albany County, 121 U. S. 535, 7 S. Ct. 1234, 30 L. Ed. 1000. The trial court likewise found—

"It has since been ascertained that in the case of many such sales, the certificates so delivered by said depositary were certificates held by plaintiff on March 1, 1913, and in other cases plaintiff is unable to identify the certificates delivered by the depositary on such sales, as those received by it on the purchases above found. In one case only, does the proof show that the certificates delivered on a sale were those actually received by the depositary on a purchase above found."

The contention of the collector is that the certificates delivered are conclusive as to the identity of the stock sold. Upon this, the trial court, in a memorandum opinion said:

"Where a party has held stock for many years, and later buys more, and in this case it is admitted that plaintiff bought a great deal more after 1913 than he sold in 1918, he has a right to decide which stock he is going to sell. The Government has not the power to say that if the taxpayer sells any of his holdings in a particular company, it can say conclusively that he sold the stock bought at the cheapest price or the shares purchased before or after a certain date. He has the right to decide that himself."

■ In our opinion, proof of the certificates delivered does not conclusively determine what transaction did in fact take place. It is evidence, but not exclusive evidence. So it is of the question of intent of the seller, a point much labored at the trial and here; it is some evidence as to what was done, but not conclusive. The ultimate question is, What was done? It was, and must be, readily conceded that if there had been a written contract of the sale of this stock, specifying "the shares purchased by me in 1916," and a clerk in the office of a trust company had delivered certificates acquired at an earlier date, the "identity of the lot" could be and would be determined by the contract. There being no applicable statute of frauds, the finding of the trial court, upon ample evidence, identifies the lot as well as a written contract. In the case at bar, the sale was consummated on the floor of the New York Stock Exchange. The plaintiff's broker, for the plaintiff, offered for sale a block of shares he purchased in 1916. True, the broker did no more than offer "1,000 shares of Chino Copper," but the finding is that this "1,000 shares of Chino Copper" was "the lot" acquired in 1916. Another broker accepted the offer for his customer. Neither the buying broker nor the customer knew or cared what "lot" was offered. A binding contract was made upon such acceptance, and legal results would flow from it, if no certificates

were ever delivered. In re Columbus Buggy Co. (8 C. C. A.) 143 F. 859.

We are saved any inquiry into the abstruse question as to the exact quality of the transaction. In a very true sense, a stockholder of a corporation is an owner of an undivided interest in the properties of the corporation. The purchase of additional shares increases that ownership. When he sells shares, his ownership is lessened, and theoretically it might be difficult to identify the portion sold either as that acquired in 1916, as plaintiff claims, or that owned in 1913, as the defendant claims. But the tax laws are practical; consideration is given to the fact that men do buy stock in various lots, and sell them in the same way. Judge Learned Hand has said, on this point:

"The plaintiff answers this argument by saying that, if so, all shares at any time held by a stockholder must be brought into hotchpot and averaged. I scarcely think that consistency requires me to go so far. The law may, and in fact does, recognize an identity in every share, which can indeed be traced upon the books of the company, at least until certificates are consolidated, and later subdivided. The purchase of a number of shares can be earmarked by the certificate, and it is an enormous convenience to keep the purchases separate." Towne v. McElligott (D. C.) 274 F. 960, 963.

A theoretical plan might have been devised, by which an average cost or March 1, 1913, value of all shares owned should be ascertained as a starting point from which to figure profit or loss on sales. But the government adopted a more practicable method, and it is incorporated in Regulations 45, Article 39, which reads:

"When shares of stock in a corporation are sold from lots purchased at different times and at different prices and the identity of the lots cannot be determined the stock sold shall be charged against the earliest purchases of such stock. The excess of the amount realized on the sale over the cost of the stock, or its fair market values as of March 1, 1913, if purchased before that date, will be the profit to be accounted for as income."

Both parties agree that the regulation is a valid one, and it answers this law suit. The trial court has found, on sufficient evidence, that the "identity of the lots" can be and has been determined. This finding cannot be overturned because one piece of evidence—the certificates delivered—is to the contrary. Cases holding that a situs for the purpose of taxation may be acquired by the location of the certificates do not persuade. Safe Deposit & Trust Co. v. Virginia, 280 U. S. 83, 50 S. Ct. 59, 74 L. Ed. ——; Wheeler v. Sohmer, 233 U. S. 434, 34 S. Ct. 607, 58 L. Ed. 1030; De Ganay v. Lederer, 250 U. S. 376, 39 S. Ct. 524, 63 L. Ed. 1042; Maguire v. Trefry, 253 U. S. 12, 40 S. Ct. 417, 64 L. Ed. 739; Critchton v. Wingfield, 258 U. S. 66, 42 S. Ct. 229, 66 L. Ed. 467. That certificates of stock are but evidence of ownership, and that the ownership follows the owner, and not the certificates, is still a settled principle of our law. Blodgett v. Silberman, 277 U. S. 1, 9, 48 S. Ct. 410, 413, 72 L. Ed. 749, and cases therein cited. In that case it is held—

"At common law the maxim 'mobilia sequunter personam' applied. There has been discussion and criticism of the application and enforcement of that maxim, but it is so fixed in the common law of this country and of England, in so far as it relates to intangible property, including choses in action, without regard to whether they are evidenced in writing or otherwise and whether the papers evidencing the same are found in the state of the domicile or elsewhere, and is so fully sustained by cases in this and other courts, that it must be treated as settled in this jurisdiction whether it approve itself to legal philosophic test or not. Further, this principle is not to be shaken by the inquiry into the question whether the transfer of such intangibles, like specialties, bonds or promissory notes, is subject to taxation in another jurisdiction. As to that we need not inquire. It is not the issue in this case. For present purposes it suffices that intangible personalty has such a situs at the domicile of its owner that its transfer on his death may be taxed there."

See, also, Farmers' Loan & Trust Co. v. Minnesota, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. ——.

While the presence of certificates may, in some circumstances, afford a situs for taxation, it is still true, in law and fact, that "certificates are only evidence of the ownership of the shares" (Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 13, 20 S. Ct. 559, 563, 44 L. Ed. 647), and they are but "a muniment of the holder's title to a proportionate interest in the corporate estate vested in the corporation." Harriman v. Northern Securities Co., 197 U. S. 244, 294, 25 S. Ct. 493, 504, 49 L. Ed. 739; 14 C. J. 478.

The judgment of the trial court is affirmed in case No. 1.

The second appeal is by the taxpayer, and grows out of the sale of stock in the Granite Gold Mining Company. He acquired this stock in 1915 and 1917, and sold it in 1918, for $20,045.58 less than he paid for it. Through clerical error, he claimed a loss of only $18,188.71 on this account. Penrose owned other stock in this company prior to 1913, and in auditing his 1918 return, the collector erroneously assumed that the certificates delivered were of old stock. It later developed that the collector was in error in this assumption, and it is now conceded, not only that the stock sold was that later acquired, but that the certificates delivered were of the later acquisition. So on the merits, it is clear that the taxpayer has paid $9,901.23 more tax than was due.

Recovery was denied by the trial court on the ground that no claim for refund was made on account of this stock. The loss on the Granite stock was claimed in his income tax return, although not identified by name. The amount paid under protest included the tax on this transaction, and the amount specified in the claim for refund, duly filed, included it. The statute provides that no suit shall be maintained "until a claim for refund or credit has been duly filed with the Commissioner of Internal Revenue." Section 3226, Rev. St., as amended (26 USCA § 156). It has been held that a claim "for amounts paid by it as taxes which * * * it may have paid in excess of the amount legally due" is too general. Maryland Casualty Co. v. United States, 251 U. S. 342, 354, 40 S. Ct. 155, 159, 64 L. Ed. 297. The claim here, after setting out the amount, states:

"1. That the losses claimed by the taxpayer and disallowed by the Department for the taxable year 1918, were proper deductible losses and were improperly disallowed, as will more fully appear from the affidavit and evidence submitted by the taxpayer in connection with his plea for abatement of this tax.

"2. That the additional assessment was wholly unwarranted and illegal, and that the tax paid thereon was exacted illegally and without warrant of law."

If the record stopped here, the interesting question argued at length would be presented. But it does not stop. The record further discloses that in an appeal to the commissioner for relief from the proposed assessment, and again in a petition for rehearing, the taxpayer twice set out in detail his grievances; four transactions are gone into in detail, but the Granite stock is not mentioned. Although the record is not clear, it is probably true that a similar statement was attached as an exhibit to his claim for refund. The purpose of a claim is to advise the government of what you are claiming. Nichols v. United States, 7 Wall. 122, 19 L. Ed. 125. This claim, considered in the light of the attached exhibit and the detailed statement on appeal to the commissioner, cannot be held fairly to advise the government of the claim of the taxpayer for a refund on the Granite stock.

But defects in the claim may be waived. Tucker v. Alexander, 275 U. S. 228, 48 S. Ct. 45, 72 L. Ed. 253. When this suit was filed, on March 11, 1926, the plaintiff specifically set out his claims, including that for the Granite stock, and payment of the tax under protest in the sum of $85,799.04, which sum included the tax paid on account of the Granite stock. He then alleged:

"That thereafter, and on or about the 9th day of July, 1924, the plaintiff filed with the defendant his claim for refund for the tax wrongfully and unlawfully imposed upon him, and paid by him as aforesaid, which claim for refund was denied on or about the 2nd day of January, 1925."

The defendant was then advised that plaintiff proposed to prove a proper claim for refund for taxes paid on account of the Granite stock. The answer of the collector was filed on May 1, 1926. If the collector proposed to make an issue of the sufficiency of the claim for refund of the tax paid on the Granite stock, set out in detail in the complaint, fair pleading would have dictated an answer admitting the claim of refund as to the copper stocks, and denying it as to the Granite stock. Instead, the defendant answered:

"As to paragraph numbered XII of said amended complaint, the defendant admits that on or about the Ninth day of July, 1924, the plaintiff filed a claim for refund for the sum of $85,799.04 additional tax assessed for the year 1918, which claim for refund was denied on or about January 2, 1925."

The plaintiff claims that this admission removed the sufficiency of the claim from the field of controversy. The defendant claims that he simply admitted the existence of the claim, and that the claim itself must be looked to for the sufficiency of its contents.

Section 281(b) of the Revenue Act of 1924 (26 USCA § 1065 note) provides that

no credit or refund shall be allowed unless claim therefor is made within four years of the payment of the tax; the 1926 law (§ 284(b), 26 USCA § 1065) is to the same effect, except the time is three years. If the defendant had challenged the sufficiency of the claim by his answer, the plaintiff had abundant time to supply the deficiency by a new or an amended claim. When the point was first raised at the trial, in October, 1928, both periods of limitation had expired.

The question is not free from doubt, but on the whole, we are of the opinion that the sufficiency of the claim for refund was not put in issue, and that the plaintiff is entitled to recover this tax. The defendant concedes that he is entitled to it on the merits; and while "men must turn square corners when they deal with the Government" (Rock Island, etc., R. Co. v. United States, 254 U. S. 141, 41 S. Ct. 55, 56, 65 L. Ed. 188), the government ought to turn square corners when dealing with its citizens. There is another maxim applicable in both of these appeals, and that is that substance should be given the right of way over form. Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; Bowers v. Kerbaugh-Empire Co., 271 U. S. 170, 46 S. Ct. 449, 70 L. Ed. 886.

The claim for refund should have been more particular; but if the defendant expected to avoid the repayment of this illegally collected tax on that account, he should have been more particular in his answer. The derelictions of the parties are about equal, and if the matter is at large, the tax ought to be repaid, for concededly the government has no right to it.

The judgment denying the plaintiff relief in case No. 2 is reversed.

Since there are special findings of fact, not in dispute, there is no occasion for a new trial. Fort Scott v. Hickman, 112 U. S. 150, 5 S. Ct. 56, 28 L. Ed. 636; Rathbone v. Board of Com'rs (8 C. C. A.) 83 F. 125; Olivier v. Mt. Union Tanning & Extract Co. (3 C. C. A.) 264 F. 601; Walker v. Gulf & I. Ry. Co. of Texas (5 C. C. A.) 269 F. 885; Routzahn v. Mason (6 C. C. A.) 13 F.(2d) 702. Judgment should be entered for plaintiff for the sum of $9,901.23.

Affirmed in No. 1.

Reversed in No. 2.

COTTERAL, Circuit Judge, dissents in case No. 1.