**TURKS HEAD CLUB v. BRODERICK.**

No. 4290.

Circuit Court of Appeals, First Circuit.

March 15, 1948.

Edward W. Day, of Providence, R. I. (Percy M. Gardner and Gardner, Day & Sawyer, all of Providence, R. I., on the brief), for appellant.

Abbott M. Sellers, Sp. Asst. to Atty. Gen. (Theron L. Caudle, Asst. Atty. Gen., Helen R. Carloss, George A. Stinson, and A. Barr Comstock, Sp. Assts. to Atty. Gen., and George F. Troy, U. S. Atty., and Edward M. McEntee, Asst. U. S. Atty., both of Providence, R. I., on the brief), for appellee.

Before MAGRUDER and WOODBURY, Circuit Judges, and HEALEY, District Judge.

MAGRUDER, Circuit Judge.

This is an appeal by the Turks Head Club from a judgment for the defendant entered by the United States District Court for the District of Rhode Island in a suit for refund of taxes paid by appellant's members on their dues, membership fees and initiation fees for the months of May, June, July and August, 1944, in the total amount of $3,161.09. The taxes were exacted under the provisions of § 1710 of the Internal Revenue Code, which, as amended by § 543(a) of the Revenue Act of 1941, 55 Stat. 711, 26 U.S.C.A. Int.Rev.Code, § 1710, and by § 302(a) of the Revenue Act of 1943, 58 Stat. 61, now incorporated in I.R.C. § 1650, 26 U.S.C.A. Int.Rev. Code, § 1650, imposes a tax of 20 per centum "of any amount paid as dues or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10 per year," and the same per centum of "any amount paid as initiation fees to such a club or organization, if such fees amount to more than $10, or if the dues or membership fees, not including initiation fees, of an active resident annual member are in excess of $10 per year." The action was brought originally against Joseph V. Broderick, who was Collector of Internal Revenue for the District of Rhode Island when the taxes involved herein were assessed and collected; upon his death, Anna C. Broderick, administratrix of his estate, was substituted as defendant. The opinion of the District Court is reported in, 1947, 71 F.Supp. 272.

There is no dispute over the facts. Most of them are stipulated by the parties, in substance as follows:

The club was organized in 1912 as a non-business corporation under the provisions of § 11, c. 212, Class III, of the Rhode Island General Laws of 1909, which provide in part: "All * * * corporations formed for religious, charitable, literary, scientific, artistic, social, musical, agricultural or sporting purposes, not organized for business purposes, and all other corporations of like nature not hereinbefore otherwise provided for, shall be created in the following manner * * *." The purposes of the club as expressed in its charter are the "maintenance of club rooms for the use of its members, the promotion of the business interests of its members, the advancement of the mercantile and industrial life of the City of Providence and vicinity, and the encouragement of social intercourse."

Except for local personal property taxes, and those now in litigation, the club has never paid taxes of any kind. It applied for, and was granted, exemption from the

federal corporation income tax[1] and has not been subjected to the Rhode Island corporation tax.

During the tax period in question, the club occupied, under lease, the sixteenth floor of the Turks Head Building in the City of Providence. Its rooms consisted of one large and one smaller dining room for men only, normally seating approximately 175 and 30 respectively; one dining room, normally seating about 45, for ladies, with or without male escorts; kitchen and pantry; washroom for men; washroom and powder room for ladies; foyer containing a counter for the sale of cigars and other tobacco products; and a lounge room for men, containing the Providence Journal and seven out-of-town newspapers. All of these rooms were light and airy, adequately and attractively furnished and properly serviced and maintained. The men's dining rooms afforded a wide and attractive view over the water, the city and the surrounding country.

The club rooms were open only on Mondays through Fridays, with the exception of holidays, between the hours of 11:30 A.M. and 3:00 P.M., during which period meals, with or without wine or beer, table d'hote or a la carte, were served in the dining rooms. The number of persons served meals or food averaged in the neighborhood of 250 daily. Meals were charged to the members who ordered them. The club gave no dances, receptions, banquets, teas, musicals, lectures or card parties. It had no facilities for swimming, golf, tennis, squash or other forms of athletics, and no radio, victrola, piano, card rooms, pool or billiard rooms or tables, and no game rooms. At meals there were no speeches or incidental music, and the club conducted no other form of amusement and no entertainment or social functions for its members. It had no reciprocal arrangements with other clubs.

During the year 1944 the club's membership was composed of approximately 600 resident members, 30 non-resident members, and 19 life members. The breakdown with respect to occupations was roughly as follows: Business 375 (finance 65, manufacturing 220, others 90); Professional 225 (lawyers 110, doctors 15, others 100).

The financial statement of the club for the fiscal year ending August 29, 1944, reveals that the club during that period received income from sources and in amounts as follows:

| | |
|---|---|
| Dues, | $28,627.10 |
| Initiation fees, | 962.50 |
| Ladies' privilege cards, | 1,440.85 |
| Special assessments, | 1,368.80 |
| Cigars, tobacco, etc., | 2,913.09 |
| Liquor, | 475.72 |

The restaurant operated at a loss of $5,670.17. Thus gross operating gain was $30,320.99. Administrative expenses totaled $24,949.17, leaving a net operating gain of $5,371.82. The club's balance sheet as of August 29, 1944, shows assets of $43,013.44, including cash of $29,940.66, and furniture and fixtures of $10,525.13 before depreciation.

Other facts not stipulated, but uncontradicted, were testified to at the trial or appear in exhibits. The small dining room is frequently reserved for luncheon conferences by directors or other business groups. The club is managed by a board of 16 governors elected by the membership. Under the by-laws membership in the club is limited to "gentlemen of good standing" 21 years of age or over, and to such number, not less than 675 nor more than 700, as the board of governors shall from time to time determine. Candidates for membership must be proposed and seconded by two resident members who are not members of the board of governors, and these members must write letters of recommendation to the governors stating the candidate's qualifications. All candidates must be personally known to at least two governors. Names of all candidates are posted on the bulletin board for at least 14 days prior to action by the governors, and they are elected by the

---

[1] Presumably under I.R.C. § 101(9), 26 U.S.C.A. Int.Rev.Code § 101(9), which exempts "Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder." See also U.S. Treas. Reg. 111, § 29.101 (9)-1.

governors, three negative votes preventing election. All election proceedings of the governors are "secret and confidential" and not to be divulged outside of the board on pain of expulsion from the club.

The annual dues of resident members are $50 for those 35 years of age or over, and $25 for those under 35. Annual dues for non-residents are $25. Initiation fees are in such amounts as the board of governors from time to time determines.

The Rules of the House Committee permit any person eligible for resident membership to be admitted to the club rooms as a guest of a member once in 30 days, and a person not so eligible to be admitted as a guest for a term not exceeding five consecutive days at any one time and not exceeding a maximum of 30 days a year. Ladies and children of a member's household may lunch at any time with a member in the ladies' restaurant. Private dining rooms may be engaged by private parties of four or more upon application to the superintendent, for use between the hours of noon and 3:00 P. M.

The Rules provide that ladies' privilege cards may be issued by the secretary to ladies of the immediate household of a member, over 18 years of age, for a fee of $6, and to widows and unmarried daughters of deceased members, over 18 years of age, for a fee of $10. These cards entitle their holders to the same privileges and use of the ladies' portion of the club as those to which members are entitled in the other rooms. In practice, ladies are given the additional privilege of having guests, male or female, lunch with them and partake of club facilities for a period not to exceed five days. If a privilege-card holder desires to bring more than three or four guests to lunch at any one time, she is expected to request in advance permission of the steward or waitress in charge, but there are no limitations in the rules as to the number of her guests. An average of 30 to 35 ladies lunch at the club daily. There were 214 ladies' privilege cards outstanding in May, 217 in June, 222 in July, and 224 in August, the months here in question.

On January 25, 1930, the Commissioner of Internal Revenue ruled that during the period from April 20, 1925, to March 26, 1929, the club was not a social club within the meaning of § 413 of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev. Acts, page 441 (the statute then imposing the tax on club dues and fees), and of the applicable Treasury Regulations, and that the dues and fees paid by its members were not subject to the taxes imposed thereunder. He therefore granted the club's claim for a refund of taxes collected for that period. It is not suggested, however, that this ruling in any way estopped or precluded the government from asserting that the club dues of a later period were taxable. The administrative ruling could have no such binding effect. See Schafer v. Helvering, 1936, 65 App.D.C. 292, 83 F.2d 317, 320; 10 Mertens, Law of Federal Income Taxation, § 60.14 (1943).

On January 19, 1944, the Commissioner ruled that the club was a social club within the meaning of § 1710 of the Internal Revenue Code, and that the dues and initiation fees paid by the members would thereafter be taxable. The club proceeded to collect the taxes from its members and paid them to the Collector. In August and September, 1944, it filed four claims for refund, covering each of the months in question. These claims were rejected by the Commissioner with the explanation:

"Since the evidence shows that the activities of the club consist of luncheons served for its members during the lunch hour and in view of the club quarters maintained and the facilities afforded the members, it was held on January 19, 1944, reversing the ruling dated January 25, 1930, that the club qualifies as a social club within the meaning of Section 1710 of the Internal Revenue Code, as amended, and the dues and initiation fees paid are subject to the tax imposed by that section.

"In view of the foregoing, the tax in question was properly due and the claims are rejected."

Upon denial of the refund, the club filed its complaint below, alleging that the taxes in question had been illegally collected because it was not a "social club" within the meaning of the statute, and demanding judgment for $3,161.09 with interest. In

the stipulation above referred to, the parties agreed that the only issues in the case were (a) whether during the period in question Turks Head Club was a social club within the meaning of I.R.C. § 1710 as interpreted by the applicable Treasury Regulations, and (b) whether the club was barred from recovery because no powers of attorney were filed with the Bureau of Internal Revenue on behalf of the club's members, as required by § 101.42 of Treasury Regulation 43 (1941 ed.).[2]

The District Court made no ruling on the second of these issues. On the first, it found that "the social features of the Turks Head Club are a material purpose of its organization and are not subordinate and merely incidental to the active furtherance of a different and predominant purpose"; and that "the facts in the instant case bring the Turks Head Club within the term 'social' used in § 1710 of the Internal Revenue Code." The correctness of this ruling is now before us. Also, the government stands on its contention that in any event the club could not recover in this action, since its claims for refund were not accompanied by powers of attorney executed by its members.

We think appellant's failure to procure and file the powers of attorney constitutes a fatal defect in its case. Even now it does not appear that the club was ever authorized by its members to claim a refund and obtain payment of the same on their behalf.

The tax in question is laid upon the dues-paying members, as is specifically provided in I.R.C. § 1710(b), not upon the club. The club has the burden of collecting the tax, paying it over to the government, filing returns, and complying with other administrative duties as the Commissioner may prescribe, I.R.C. §§ 1715, 1716, 1720, 3661, 26 U.S.C.A. Int.Rev.Code, §§ 1715, 1716, 1720, 3661; and any "willful" failure to comply with these requirements will subject the club to the penalties prescribed by I.R.C. § 1718, 26 U.S.C.A. Int.Rev. Code, § 1718. But the club is not liable for the tax if a member refuses to pay it or if for any other reason the tax cannot be collected from such member; § 101.37 of Regulations 43 (1941 ed.) provides in such cases that the club is to report the refusal of the member to the Commissioner, who will then make a direct assessment of the tax against the individual member.

Therefore, the right to claim a refund is in the club member as taxpayer. Shannopin Country Club v. Heiner, D.C. W.D.Pa.1924, 2 F.2d 393. It is only as authorized agent of the members, evidenced by powers of attorney in the form prescribed by the regulation, that a club has any standing to put in a claim for refund on behalf of the members. See Sharp & Dohme, Inc. v. United States, 3 Cir., 1944, 144 F.2d 456, 458, 459. The club is hardly in a position to challenge the validity of such regulation. See Lash's Products Co. v. United States, 1929, 278 U.S. 175, 176, 49 S.Ct. 100, 73 L.Ed. 251. In any case, the regulation is clearly a reasonable and valid requirement, for it is designed to obviate the payment by the government of a refund to a person not the taxpayer without satisfactory written evidence of the authority of the claimant to receive payment on behalf of those entitled; otherwise double liability might result. Such require-

---

2 "Abatement or refund of erroneous or illegal assessments or collections.—A claim for abatement or refund of taxes alleged to have been erroneously or illegally assessed or paid * * * must be filed by the person against whom they were assessed, or by whom they were in the first instance erroneously or illegally paid. * * * In any case where a club as agent of its members seeks a refund of tax collected by the club and paid over by it to the Collector of Internal Revenue, since the members and not the club are the actual taxpayers, the claim must be accompanied by the following: * * * (b) A power of attorney executed by each person in whose behalf the claim is filed authorizing the organization to act as his agent. The power of attorney must be prepared in the usual form of such instruments; must be acknowledged before a notary public or signed in the presence of two witnesses, and must include a statement that any revocation thereof will not be effective unless the Commissioner receives notification. * * * *"

ment has appeared in the same language in every revision of the regulations subsequent to their first promulgation under the Revenue Act of 1926, the original statute imposing the present tax on club dues and fees. See 26 Code Fed.Reg. § 100.54 (1939); Id., Supp.1940, § 101.56. "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." Helvering v. Winmill, 1938, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52.

In Builders' Club of Chicago v. United States, 1926, 14 F.Supp. 1020, at page 1022, 83 Ct.Cl. 556, the Court of Claims held the regulation invalid, stating: "A departmental regulation which treats the club merely as an agent of its members and requires that the individual club members each file claim for refund for the taxes paid by the club or give to the club duly executed powers of attorney to act as their agent is obviously legislation in the guise of a regulation and therefore invalid." Whether the Court of Claims would still adhere to this view, we cannot say. Cf. Engineer's Club of Philadelphia v. United States, 1942, 42 F.Supp. 182, 188, 95 Ct.Cl. 42, and concurring opinion by Whitaker, J., certiorari denied 1942, 316 U.S. 700, 62 S.Ct. 1294, 86 L.Ed. 1769. For the reasons already set forth, we think it plain that the tax is upon the members, not upon the club, and therefore that the court's conclusion in the Builders' Club case rested upon a faulty premise.

It is contended by appellant that the Commissioner "waived" the requirement of his regulation with reference to powers of attorney by examining and rejecting the claim on the merits, without objecting on the score of the club's failure to file the powers of attorney. In Angelus Milling Co. v. Commissioner, 1945, 325 U.S. 293, 296, 65 S.Ct. 1162, 1164, 89 L.Ed. 1619, it is said: "Candor does not permit one to say that the power of the Commissioner to waive defects in claims for refund is a subject made crystal-clear by the authorities." The Commissioner may effectively waive certain requirements of his regulations as to the form and content of

claims for refund. Tucker v. Alexander, 1927, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253; United States v. Memphis Cotton Oil Co., 1933, 288 U.S. 62, 71, 53 S.Ct. 278, 77 L.Ed. 619; United States v. Garbutt Oil Co., 1938, 302 U.S. 528, 533, 534, 58 S.Ct. 320, 82 L.Ed. 405; Howbert v. Penrose, 10 Cir., 1930, 38 F.2d 577, 68 A.L.R. 820. But even apart from the regulation now in question, the Commissioner is certainly without authority to pay out a refund to a claimant not the taxpayer, unless such claimant is the duly authorized agent of the taxpayer. Therefore we do not see how the Commissioner's action in rejecting the club's refund claim on the merits can have the effect of waiving the requirement, necessary for the government's protection, that the club must furnish proof of its agency to represent the members and collect the refund on their behalf. This is not the kind of formal defect in refund claims with respect to which the cases have recognized the possibility of a waiver by the Commissioner. It follows that I.R.C. § 3772(a) (1), 26 U.S.C.A. Int.Rev.Code, § 3772(a) (1), is an obstacle to the maintenance of the present suit. That section provides: "No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected * * * until a claim for refund or credit has been duly filed with the Commissioner, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."

On the merits, we think the District Court was right in concluding that the Turks Head Club was a "social club" within the meaning of I.R.C. § 1710. We shall not undertake an extensive review of the decided cases—which are legion—involving application of this tax on club dues; the cases so largely turn on their particular facts.

The Code contains no definition of "social club." In Regulations 43 (1941 ed.), the following elaboration of the phrase appears (26 Code Fed.Reg., Supp.1941, §§ 101.24, 101.25):

"§ 101.24 Determination of character of club. The purposes and activities of a

club or organization and not its name determine its character for the purpose of the tax. Every club or organization having social * * * features is presumed to be included within the meaning of the phrase, 'any social * * * club or organization,' until the contrary has been proved, and the burden of proof is upon it. * * *

"§ 101.25 Social clubs. Any organization which maintains quarters or arranges periodical dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse, is a 'social * * * club .or organization' within the meaning of the Code, unless its social features are not a material purpose of the organization but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as, for example, religion, the arts, or business. The tax does not attach to dues or fees of a religious organization, chamber of commerce, commercial club, trade organization, or the like, merely because it has incidental social features, but if the social features are a material purpose of the organization it is a 'social * . * * club or organization' within the meaning of the Code. * * *"

There is a line of decisions in the Court of Claims taking the view that the furnishing of meals to club members is in itself a non-social activity, and if this is the predominant purpose of the club, other features, of a social character, being merely subordinate or incidental to the active furtherance of such predominant purpose, then that the club is not a "social club" within the meaning of the statute and the regulations above quoted. See Merchants Club v. United States, Ct.Cl., 1946, 66 F.Supp. 126, and earlier cases cited therein. The argument is that eating "can scarcely be classed as a social activity since it is uni-versal and necessary." 66 F.Supp. at page 129.

But if one invites friends to dinner, the occasion is a social one, in common parlance, whether the guests are moved to acceptance by contemplation of the fine meal they will have or of the pleasant company wherewith to beguile away the time. And so, it seems to us, when a group of men get together to form a club for the major purpose of furnishing private quarters of attractive outlook where carefully screened congenial spirits, and members of their families and guests, can partake together of food and drink, they have formed a "social club" in the everyday use of language, and in what we think must have been the sense of Congress in imposing this luxury excise tax. Eating is a universal human necessity. But eating in a select company in such agreeable environment as the Turks Head Club is a luxury. In this way the club has furthered one of its declared purposes, "the encouragement of social intercourse." Certainly the facts in the record indicate that in practice its activities have been directed mainly to this end; so far as other purposes have been served, such as the promotion of the business interests of the members and the advancement of the mercantile and industrial life of the city, these have only been incidental by-products.

We are in general agreement with the views expressed in Duquesne Club v. Bell, 3 Cir., 1942, 127 F.2d 363, 143 A.L.R. 1377, certiorari denied, 1942, 317 U.S. 638, 63 S.Ct. 30, 87 L.Ed. 514, which has become a leading case. In so far as our present decision may be deemed not in harmony with the brief opinion of this court in Page v. Squantum Ass'n, 1 Cir., 1935, 77 F.2d 918, that case is now overruled.

The judgment of the District Court is affirmed.