ESTATE OF JAMES W. ANDERSON, DECEASED, RICHARD K. ANDERSON, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent
Estate of Anderson v. Commissioner
Docket No. 21508-87.
United States Tax Court
T.C. Memo 1988-511; 1988 Tax Ct. Memo LEXIS 536; 56 T.C.M. (CCH) 553; T.C.M. (RIA) 88511; October 31, 1988. Walter H. Bush, Jr., Milford B. Hatcher, Jr., Linda W. Munden and Oliver C. Murray, Jr., for the petitioner. Charles P. Hanfman, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in the Federal estate tax due from the Estate of James W. Anderson in the amount of $ 1,212,527. After concessions, the issue remaining for our decision is whether decedent made a gift to his son in 1982 by contributing common stock of three operating companies to a newly formed holding company in exchange for preferred stock. FINDINGS *537 OF FACT James W. Anderson ("decedent") died testate on July 8, 1983. Decedent's son, Richard K. Anderson ("Anderson") is the duly appointed executor of the Estate of James W. Anderson (the "Estate"). At the time the petition was filed, Anderson resided at Macon, Georgia. Decedent, his father and his brother founded the Anderson Chemical Company, Inc. of Macon, Georgia ("Anderson Georgia") in 1946. They subsequently formed the Anderson Chemical Company of Tennessee ("Anderson Tennessee") and the Anderson Chemical Company of Texas ("Anderson Texas"). All three companies (referred to collectively as the "Operating Companies") are in the business of producing and distributing formulated chemical products for water treatment. Each of the Operating Companies has authorized and issued one class of common stock. Subject to limited exceptions, only employees, officers, directors and retired employees of each Operating Company are permitted to acquire stock. Upon termination of employment for any reason except retirement, employees must offer to sell their stock back at book value. Any stockholder wishing to sell his stock must offer it to the corporation, or, if the corporation fails *538 or refuses to exercise its option to purchase, to the other shareholders at book value. A deceased employee's surviving spouse or children of trusts for their benefit may retain stock, but no other transfers of stock to nonqualified persons are permitted without corporate authorization. Pursuant to amendments to the bylaws of each Operating Company approved by the respective shareholders on May 29, 1982, the Boards of Directors may authorize in writing a transfer to a person who is not an employee, officer, director or retired employee and may also authorize such a transferee to hold the stock free of the foregoing restrictions. As of May 16, 1982, the stock of the Operating Companies was held by 48 individuals. Decedent was the largest shareholder and president of each Operating Company in 1982. Decedent and Anderson owned stock in the Operating Companies in the following percentages: ANDERSON
ANDERSON
ANDERSON
GEORGIA
TENNESSEE
TEXAS
Decedent
48.92%
45.58%
39.53%
Richard K. Anderson
2.06%
.49%
.63%
TOTAL
50.98%
46.07%
40.16%
Anderson worked in various positions with the Operating Companies from the time he was 12 years *539 old and in 1982 was vice president in charge of sales and a director of the Operating Companies. Decedent planned to have Anderson, who was the only one of decedent's children active in the management of the Operating Companies, take over management when he was no longer able. In November 1981, decedent obtained an appraisal of his common stock holdings in the Operating Companies. The appraisal showed the following ranges of values, rounded to the nearest five thousand, for decedent's stock as of August 31, 1981: Low
High
Anderson Georgia
$ 1,565,000
$ 1,735,000
Anderson Tennessee
680,000
870,000
Anderson Texas
515,000
640,000
Total
$ 2,760,000
$ 3,245,000
The average of the sum of low and high ends of the ranges of values is approximately $ 3,000,000. Both parties accept this valuation as the value of decedent's common stock holdings in the Operating Companies at the time he transferred the stock to the Holding Company. The appraisal report further concluded that Anderson's shares of common stock in the Operating Companies had a value of $ 86,910 as of August 31, 1981. The financial statements of the Operating Companies *540 for their fiscal years ended March 31, 1978 through March 31, 1983, show the following net earnings and total dividends paid by each company in those years: Net
Cash
Fiscal Year
After-Tax
Dividends
Ending
Earnings
Paid
3/31/78
Anderson Georgia
278,207
75,390
Anderson Tennessee
123,828
34,470
Anderson Texas
117,639
27,175
3/31/79
Anderson Georgia
256,000
106,575
Anderson Tennessee
199,267
49,035
Anderson Texas
169,700
38,767
3/31/80
Anderson Georgia
308,090
107,505
Anderson Tennessee
167,969
49,837
Anderson Texas
167,439
39,731
3/31/81
Anderson Georgia
325,406
108,129
Anderson Tennessee
198,685
50,211
Anderson Texas
181,271
40,068
3/31/82
Anderson Georgia
450,863
185,290
Anderson Tennessee
232,601
113,387
Anderson Texas
218,117
90,703
3/31/83
Anderson Georgia
467,228
139,575
Anderson Tennessee
157,436
85,491
Anderson Texas
218,340
67,476
With the exception of the fiscal year ended March 31, 1983, the amounts of dividends paid increased each year. The Operating Companies followed a conservative dividend policy during the above years because they were accumulating funds for expansion *541 of operations. On May 17, 1982, decedent and Anderson formed the J. W. Anderson Holding Co. (the "Holding Company") under the laws of the State of Georgia. The Articles of Incorporation authorized the issuance of 100,000 shares of $ 100 par value Class A preferred stock, 1,500,000 shares of $ 1 par value Class B preferred stock and 1,000,000 shares of $ 1 par value common stock. Decedent and Anderson were the initial directors of the Holding Company. Pursuant to its bylaws, the Holding Company would have no fewer than three nor more than five directors. Pursuant to the Articles of Incorporation, the directors resolved by unanimous consent on May 17, 1982, that the $ 100 par value Class A preferred stock would carry a 13 percent noncumulative annual dividend, payable quarterly when and as declared by the Board of Directors, and would have a liquidation preference equal to par value. The Class A preferred stock had preference over both the Class B preferred and the common as to dividends and liquidation proceeds. The Holding company could redeem the Class A preferred stock upon notice for $ 105 per share. The Class A preferred stock was not convertible to any other class of stock *542 and carried no voting rights except in two events: (1) either a proposed voluntary dissolution of the Holding Company, in which case each share had 100 votes, or (2) if no dividends were paid for 12 consecutive or 16 cumulative quarters, in which case each share had one vote on all other corporate matters. At the same time, the directors determined that the $ 1 par value Class B preferred stock would carry a 12.5 percent noncumulative annual dividend, payable when and as declared, and a liquidation preference equal to par value. The Holding Company could redeem the Class B preferred stock upon notice for $ 1.05 per share. The Class B preferred stock was not convertible. It carried voting rights of one vote per share. Also on May 17, 1982, decedent, Anderson and the Holding Company entered into an agreement (the "Agreement"). The Agreement provided that decedent and Anderson would transfer all of their shares in the Operating Companies to the Holding company in exchange for Holding Company stock of equal value. The Agreement further provided "In the event the fair market values of the Assets [i.e., the contributed stock] is revised as of the actual date of transfer of the Assets, *543 the number of Shares to be issued * * * shall be correspondingly revised * * *." On May 29, 1982, the Boards of Directors of the Operating Companies, pursuant to authority of the bylaws as amended that date, authorized decedent and Anderson to transfer their stock to the Holding Company which was to own the stock free of restrictions effective as of May 17, 1982. Decedent told the Boards of Directors that the purpose of the transfers was to freeze the value of decedent's stock for estate planning purposes. Another reason, which decedent did not mention to the directors, was to facilitate the transfer of future managerial control to Anderson. At the time the Holding Company was created, decedent had cancer. Pursuant to the Agreement, decedent transferred all of his stock in the Operating Companies valued at $ 3,000,000, to the Holding Company on May 17, 1982. On May 17, 1982, decedent and Anderson delivered executed investment letters to the Holding Company stating their present intention not to sell the stock to be issued by the Holding Company. On May 21, 1982, decedent received certificates representing all of the issued and outstanding preferred stock of the Holding Company *544 consisting of 20,000 shares of $ 100 par Class A non-voting preferred valued at $ 2,000,000 and 1,000,000 shares of $ 1 par Class B voting preferred valued at $ 1,000,000. Decedent held voting control of the Holding Company. Decedent controlled the Board of Directors and corporate policy and management. Decedent controlled the dividend policy of the Holding Company. Through the Holding Company decedent controlled the Operating Companies. Anderson received a certificate on May 21, 1982, representing 711,290 shares of common stock of the Holding Company, as specified in the Agreement. He did not actually transfer his stock in the Operating Companies to the Holding Company until February 16, 1983. On that date, he transferred his total holdings in the Operating Companies as of May 17, 1982, consisting of 477 shares of Anderson Georgia, 70 shares of Anderson Tennessee, and 70 shares of AndersonTexas. Dividends declared by the Operating Companies in October 1982 and January 1983 on Anderson's stock were paid by the Operating Companies to the Holding Company on February 17, 1983. The Agreement erroneously stated that Anderson contributed only 437 shares of Anderson Georgia stock *545 and received in exchange for his contribution a total of 711,290 shares of common stock of the Holding Company. In June 1983, decedent, Anderson and the Holding Company executed an agreement to correct these errors. The June 1983 agreement states that Anderson contributed 477 shares of Anderson Georgia stock to the Holding Company. The June 1983 agreement further provides that the number of shares of common stock issued to Richard K. Anderson pursuant to the Section 351 Agreement was intended to reflect the fair market value of the shares of stock transferred by Richard K. Anderson to the Corporation, but due to a mathematical error the fair market value of the shares of common stock of Anderson Chemical Company Inc. transferred by Richard K. Anderson to the Corporation was overstated * * * To correct the error, Anderson's original stock certificate representing 711,290 shares of Holding Company common stock with a value of $ 711,290 was cancelled and a replacement certificate representing 86,910 shares of common stock with a value of $ 86,910 was issued. The amendments were made as of May 17, 1982, the date of the Agreement and original transfer of stock to the Holding *546 Company. When Anderson entered into the Agreement to transfer his stock in the Operating Companies to the Holding Company, he believed that the value of the Holding Company stock he received was approximately equal to the value of the stock in the Operating Companies that he surrendered. Anderson recognized that his investment in the Holding Company involved risks. First, he risked incurring losses if the Holding Company were liquidated relatively soon after its formation. Second, by transferring his stock in the Operating Companies to the Holding Company, controlled by decedent, Anderson gave up the right to receive dividends declared by the Operating Companies without decedent's consent. Third, the board of directors of the Holding Company could direct a redemption of some or all of decedent's stock for a five percent premium above par. Anderson received only common stock in the Holding Company, the future value of which was not only dependent on the future economic condition of the Operating Companies but also was subordinate to the Holding Company's funding of the value of the preferred stock through dividends, redemption or liquidation preference. Decedent and Anderson *547 planned for Anderson to take over management of the Operating Companies and because of the state of decedent's health, any appreciation or depreciation in the Operating Companies would be due in large measure to Anderson's effort. Anderson was confident that the Operating Companies would grow under his leadership and considered the Holding Company arrangement to be a good investment and worth the risk of subordination. On issues of whether to liquidate or dissolve the corporation, decedent owned 97.2 percent of the voting rights of the Holding company and could liquidate the company at will. Decedent's Class A preferred stock had no voting rights except in the event of a proposed dissolution or liquidation. In that case, it was entitled to 100 votes per share, representing 64.8 percent of the voting rights in the Holding Company. On issues of whether to liquidate or dissolve the corporation, decedent's Class B preferred stock represented 32.4 percent of the voting rights of the Holding Company. Thus, decedent controlled 97.2 percent of the voting rights in the Holding Company in the event of a proposed liquidation or dissolution. In addition, because decedent held his stock in *548 the Holding Company free of restrictions other than those imposed by securities laws, decedent could sell his stock. Any such buyer could also have caused the Holding Company to liquidate because the Holding company held its stock in the Operating Companies free of restrictions imposed by the bylaws of the Operating Companies. Anderson recognized decedent's control over the Holding Company and that he might suffer a loss if decedent chose to liquidate the Holding Company before Anderson could realize any gain from the appreciation of his Holding Company common stock. Anderson trusted decedent completely, however, and did not believe that decedent would liquidate if it were not in Anderson's best interest. Anderson would not have contested a decision by decedent to liquidate. If decedent had sold his stock to an unrelated party who wanted to liquidate, Anderson also would not have been opposed. In corporate matters not involving a liquidation or dissolution, decedent also held voting control. While the Class A preferred did not vote (absent a failure to pay dividends for an extended period), the Class B preferred could vote on all matters. Decedent has at least 1,000,000 votes *549 on any shareholder matter while Anderson had 86,910 votes through his ownership of the common stock. OPINION The issue for our decision is whether decedent made a gift to Anderson on May 17, 1982, by his transfer to the Holding Company of common stock in the Operating Companies. [1] Respondent argues that the shares of stock in the Operating Companies transferred by decedent were of greater value than the preferred stock decedent received in exchange and that the difference was a gift to Anderson, who received Holding Company common stock in exchange for his stock in the Operating Companies. Petitioner argues that decedent and Anderson each received Holding Company stock equal in value to the stock in the Operating Companies that each surrendered, and consequently, there was no gift. Petitioner included the value of the decedent's preferred stock in the estate at $ 3,000,000 which was also value, the parties agree, of the decedent's common stock in the Operating Companies on May 17, 1982, when he contributed that stock to the Holding Company. *550 The transaction and the parties' divergent views of it may be summarized as follows: Decedent and Anderson transferred to the Holding company the stock which each held in the Operating Companies. The parties agree that the value of decedent's transferred stock in the Operating Companies of the date of transfer was $ 3,000,000. The parties also agree that the value of Anderson's transferred stock in the Operating Companies was $ 86,910. Decedent received on the exchange with the Holding Company (1) all 20,000 shares of issued and outstanding Class A preferred and (2) all 1,000,000 shares of issued and outstanding Class B preferred. Anderson received 86,910 shares of common stock in the Holding Company. Petitioner argues that the value of the stock decedent and Anderson each received in exchange for their stock in the Operating Companies was equal to the value of that stock. Because dividends on the preferred stock were noncumulative and would require higher dividend payments that the Operating Companies had historically paid, respondent argues that the preferred stock received by decedent was worth less than the Operating company stock he transferred in the exchange. Respondent *551 reasons that the difference in value must inure to the common stockholder and, therefore, that decedent made a gift to Anderson. Respondent's theory is the product of his distaste for estate planning designed to establish the value of decedent's stock prior to his death. Transactions like the one at issue were the subject of a novel valuation approach articulated in Revenue Ruling 83-120, 1983-2 C.B. 170, the principles of which respondent asks us to adopt. Revenue Ruling 83-120 straightforwardly states that, in respondent's view, ascertaining the "true fair market value" of estate planning recapitalizations "will usually result in the determination of a substantial fair market value for the common stock and a fair market value for the preferred stock which is substantially less than its par value." His analysis in this case illustrates this statement. In general, Revenue Ruling 83-120 focuses solely on valuing the preferred stock issued in a recapitalization and only derivatively determines the value of common stock issued. The derivatively value is a matter *552 of arithmetic: it is calculated by subtracting the preferred stock's determined value from the value of stock contributed in exchange for the preferred. The relative voting and preference rights and obligations of the classes of preferred and common issued, while given lip service, are disregarded. Compare Estate of Lee v. Commissioner,69 T.C. 860 (1978). Like the unsuccessful taxpayers in Hamm v. Commissioner,325 F.2d 934 (8th Cir. 1963) affg. a Memorandum Opinion of this Court, respondent seeks a formula valuation suited to the result he desires. As the Eighth Circuit said, 325 F.2d at 940: "Valuation of closely held stock is basically a question of judgment rather than of mathematics." The passage of twenty-five years has not dimmed the light of that wisdom. The Ruling's approach to valuing preferred stock requires a corporation to have earnings significantly in excess of that needed to pay both dividends and the liquidation preference on its preferred stock before the preferred stock will be found to have a value equal to par. If *553 the preferred stock is found to be worth less than its par value, which respondent concedes will almost always be the case using the analysis of the Revenue Ruling, then respondent assigns the difference between the par and determined values to the common stock. Consequently, in circumstances in which a corporation is presumed by respondent to be unable for lack of income or assets to meet its obligations to its preferred shareholders, which must be satisfied before the common shareholders are entitled to anything, Revenue Ruling 83-120 deems the common stock to be worth considerably more than the preferred. In valuing the preferred stock received by decedent, respondent states that in applying the Ruling he looks to three indicators of value: (1) yield, (2) dividend coverage, and (3) protection of liquidation preference. While these three points of financial analysis may be factors appropriate to consider in valuing a preferred stock, they are not sufficient to establish value. Voting rights are at least as important, and in this case, respondent has disregarded the decedent's voting control of the Holding Company represented by his preferred stock interest. Moreover, *554 in this case, respondent also ignored the significance that this voting control afforded decedent in the protection of his liquidation preference. Anderson received a small minority interest in the Holding Company subordinate to decedent's. Decedent received voting control, preference on dividends and liquidation and entitlement to a premium on redemption. Decedent could, by virtue of his stock ownership, control the board of directors, dividend payments, sale of assets (shares of stock in the Operating Companies) redemption payments and liquidation. Prior to the transfer of his stock to the Holding Company, Anderson received dividends on his shares of stock in the Operating Companies, but subsequent to the transfer these dividends were available for distribution on decedent's preferred stock. The parties agree that decedent's stock in the Operating Companies was worth $ 3,000,000. Anderson's stock in the Operating Companies was worth $ 86,910. Decedent and Anderson contributed this stock to the Holding Company. After the exchange, this stock was the sole asset of the Holding Company. Decedent received Holding Company stock in the exchange consisting of 20,000 shares of Class *555 A preferred, par value $ 100 and 1,000,000 shares of Class B voting preferred, par value $ 1. Anderson received 86,910 shares of voting common, par value $ 1. Decedent held 92 percent of the votes on standard shareholder matters and 97.2 percent of the votes on issues of liquidation or dissolution. Had the Holding Company been liquidated, decedent would have received all of the stock he contributed in the recapitalization; Anderson likewise would have received the stock he contributed. To the extent dividends were paid, they were payable to decedent prior to any payment to Anderson. If the Holding Company redeemed any of decedent's stock, decedent was due a 5 percent of par value premium. Decedent controlled the vote of Anderson's former stock interest in the Operating Companies. In short, Anderson's common stock in the Operating Companies, like decedent's, was full subject to the new layer of rights and obligations represented by the Holding Company. Respondent ignores decedent's voting control, his ability to liquidate the Holding Company at will which protected his liquidation preference and his acquired capability of controlling Anderson's former stock interest in the Operating *556 Companies. Moreover, respondent's analysis presumes that if the stock decedent received on incorporating the Holding Company was worth less than the stock in the Operating Companies that he contributed in exchange, the stock Anderson received on the incorporation must be worth more than the stock that he contributed in exchange. In other words, decedent is presumed to have made a gift to Anderson because Anderson's common stock, which represented 8 percent of the voting power on standard shareholder matters, would not command a dividend, could not force or prevent a liquidation, could not control corporate policy or management, was worth, in respondent's view, approximately $ 2,600,000 while decedent's preferred stock, which represented more than 90 percent of the voting power, could command dividend policy, control the board of directors and corporate management, could force, a liquidation or a redemption at a 5 percent premium and could control the polices of the Operating Companies, was worth, in respondent's view, approximately $ 480,000. [2]
*557 Respondents' expert witness, Philip Schneider, followed respondent's prescribed method for valuation as set forth in Rev. Rul. 83-120. Schneider used a measurement of the yield of preferred stock to determine the market price of the Holding Company preferred stock, as prescribed in Revenue Ruling 83-120. The yield of a stock is calculated by dividing its annual dividend by its market price. Ignoring the generally increasing dividend pattern from 1978 through 1982, Schneider used an average of dividends paid by the Operating Companies from 1978 through 1982. Schneider expected the annual dividend to the Holding Company to be $ 104,109. Schneider examined 16 publicly traded companies and calculated their average yield on preferred stock to be 14.54 percent. He then determined that an investor seeking a 14.54 percent return on his investment would be willing to invest $ 716,018 ($ 104,109 / 14.54% = $ 716,018). Schneider discounted the value of the preferred stock to reflect limited marketability because the stock was not publicly traded and because he believed that the preferred stock did not have power to force a payment of dividends, a redemption, a *558 liquidation or a sale of assets. He reasoned that although decedent held more than 90 percent of the voting rights of the Holding Company, he was only one of the directors with equal say in management decisions. Schneider further conjectured that decedent could not effect a liquidation of the Holding Company without Anderson's consent, which Anderson would not give because he would be harmed. To reflect these constraints on the power of the preferred stock, a discount of 33 percent was applied to the market price of $ 716,000, resulting in a value for the preferred stock of $ 479,732. Schneider next valued Anderson's common stock in the Holding Company. He concluded, based on Revenue Ruling 83-120, that the value of the common stock had to be the value of the stock in the Operating Companies transferred to the Holding Company less the value of the preferred stock. Schneider did not discount the value of the common stock to reflect any of the factors for which he discounted the value of the preferred stock. Schneider's report contains numerous errors and his analysis, like respondent's position, is inherently flawed. First, Schneider lists factors set forth in *559 Revenue Ruling 59-60 for use in valuing closely held stock and states that he took those factors into account in his analysis. [3] In fact, most of the factors are not discussed in the report, and those that are discussed are not incorporated into the fair market value analysis. In addition, Schneider devotes several pages of his report to an analysis of economic conditions as of May 1982 without any specific application of this analysis to the Holding Company, the Operating Companies or their customers. *560 Schneider also erred in his assertion that the Holding Company could not influence the amount of dividends paid because it did not control any of the Operating Companies. The Holding Company in fact held 50.98 percent of the stock of Anderson Georgia, giving it outright control. The Holding Company also held 46.07 percent of Anderson Tennessee and 40.16 percent of AndersonTexas. These were by far the largest blocks of stock held in either company, but Schneider made no effort to determine whether they gave the Holding Company effective control. Further, Schneider discounted the value of the preferred stock thinking that the preferred shareholder could not force a liquidation. The basis for his conclusion is a minority shareholder rights requirement in the Model Business Corporation Act, which Schneider believed was essentially the same as Georgia law, that majority shareholders treat minority shareholders fairly. From this Schneider concluded that Anderson could and would block a liquidation because it would not be beneficial to him. Fair and beneficial, however, are not necessarily the same, and Schneider so conceded from the witness stand. Under Georgia law, Anderson would *561 be entitled to a fair value for his share of the Holding Company's assets. Under Georgia law, a minority shareholder has the right to dissent from certain actions by the majority, including dissolution of the corporation. Ga. Code Ann. § 14-2-250(a)(2) (1982). The dissenting shareholder, however, is entitled to no more than the fair value of his shares. Ga. Code Ann. § 14-2-251. (1982). Furthermore, because Anderson would receive stock approximately equal in value to what he put into the Holding Company on liquidation, he would have no grounds for dissenting. Anderson would have received stock worth approximately $ 87,000. Schneider also calculated a low value for the preferred stock because he concluded that the Holding Company would not be able to pay the dividends to which the preferred stock was entitled. The preferred stock was entitled to dividends totalling $ 385,000 per year before the common stock could receive anything. Thus, if there were insufficient funds to pay the preferred stock dividends, the common stock would receive nothing. [4] On liquidation, the preferred stock *562 was entitled to $ 3,000,000 before the common could receive anything. If there were insufficient assets to satisfy the preferred stock's liquidation preference, the common stock would receive nothing (subject, of course, to dissenter's rights). Schneider's assertion that there would be insufficient funds to satisfy the preferred stock dividends is, therefore, incompatible with his conclusion that the common stock would have significant value. In response to questions from the Court, Schneider conceded this flaw in his analysis. Schneider's ultimate conclusion as to the value of Anderson's common stock is wrong. Although stock in a newly formed corporation is deemed to be equal in value to the assets exchanged for it, respondent argues that because the common stock would enjoy the benefits of any future appreciation, it had to have been worth more at the time of incorporation that the preferred stock. Aside *563 from ignoring the relative rights of the classes of stock and other significant points discussed above, respondent's position is based on speculation (that there would even be future appreciation). See Olson v. United States,292 U.S. 246, 257 (1934). It fails to address existing conditions and facts on the proper valuation date, i.e., May 17, 1982, the date of the exchange. Mac A. Jones of American Appraisal Associates valued the stock on a dissolution or liquidation basis on the instructions of petitioner's counsel. Jones also reviewed other methods for valuing preferred stock such as yield and divided rate. By valuing the preferred stock on a yield basis, Jones obtained a value of approximately $ 2,500,000. He concluded that the liquidation approach produced a more realistic result because the preferred stock would be entitled to more than $ 2,500,000 on liquidation, and a buyer of decedent's interest desiring to maximize his immediate value or to acquire the stock in the Operating Companies directly, controlling 97.2 percent of the voting power of the Holding Company on a liquidation vote, would force a liquidation. Jones first reviewed the appraisal *564 of the Operating Companies' common stock prepared in anticipation of the exchange of Operating Companies stock for Holding Company stock. He agreed that decedent's common stock had a value of approximately $ 3,000,000 as of August 31, 1981, and at the time of the exchange in May 1982. Jones disagreed with the value of $ 86,910 assigned to Anderson's stock in the Operating Companies. Because of the relatively small ownership interests Anderson held, Jones determined that a marketability discount of 25-30 percent was appropriate, less the legal costs incurred in liquidating which the Agreement provided were to be borne by the common stock. Jones believed that these costs would not exceed $ 2,000 to $ 2,500. Anderson thus also would be returned to essentially the same position if the Holding Company had been liquidated in 1982. He valued Anderson's common stock in the Operating Companies at the time of the recapitalization at $ 73,300 before deducting costs of liquidation. On formation of the Holding Company, decedent contributed stock worth $ 3,000,000 and Anderson contributed stock worth $ 86,910. Decedent's contribution amounted to 97.2 percent of the value of the Holding Company. *565 Had decedent sold his preferred stock at the valuation date, the purchaser would have been entitled to receive 97.2 percent of the assets of the Holding Company on liquidation before the common stock could receive anything. Because the sole asset of the Holding Company was the common stock in the Operating Companies, such as purchaser could acquire decedent's original investment of $ 3,000,000. Because such a purchaser would be effectively purchasing the stock in the Operating Companies, an arm's length purchase price for decedent's preferred stock on the valuation date was equal to the value of the Operating Companies stock contributed by decedent. Pursuant to the legal standard recognized universally, e.g., sec. 25.2512-1, Gift Tax Regs., a willing buyer and willing seller would exchange the preferred stock in the Holding Company on May 17, 1982, for $ 3,000,000. Decedent's and Anderson's Holding Company stock as of 1982 were approximately equal in value to the stock in the Operating Companies they exchanged. Decedent, therefore, did not make a gift to Anderson. To give effect to concessions and to permit calculation of additional estate administration expense incurred in *566 this litigation, Decision will be entered under Rule 155.
Footnotes
1. At trial, respondent raised for the first time an allegation that the transaction did not occur as corrected. The notice of deficiency assumed that the transaction occurred as corrected, and, until trial, respondent did not challenge the bona fides of the transaction. Having failed to raise this matter in his answer or by amended answer, having failed to move the file an amended answer and having failed to notify the Court or petitioner prior to trial, respondent gave petitioner no notice that respondent intended to challenge the transaction at trial. Respondent's new allegation is not simply a new argument on a pending issue but is a matter requiring different proof than the matters that have been the subject of this litigation from its inception. As a consequence, we ruled that such a challenge to the bona fides of the transaction would prejudice petitioner and constitute a new issue that respondent was barred from litigating. Estate of Goldsborough v. Commissioner,70 T.C. 1077, 1086, (1978); Estate of Horvath v. Commissioner,59 T.C. 551↩ (1973). We decline to modify our ruling and find that the transaction occurred as corrected.
2. It is idle to speculate what respondent's view would be if the positions of Anderson and decedent were reversed, viz, if decedent had received 86,910 shares of Holding Company common stock in exchange for his $ 3,000,000 worth of Operating Companies stock while Anderson received all of the Holding Company preferred stock.↩
3. Revenue Ruling 59-60 provides in relevant part: It is advisable to emphasize that in the valuation of the stock of closely held corporations or the stock of corporations were market quotations are either lacking or too scare to be recognized, all available financial data, as well as all relevant factors affecting the fair market value, should be considered. The following factors, although not all-inclusive are fundamental and require careful analysis in each case: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity of the company. (e) The dividend-paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of the stock and the size of the block of stock to be valued. (h) the market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. 1959-1 C.B. 237↩,238-239.
4. We do not have before us the question of whether decedent would make a gift to Anderson by failing to declare a dividend on the preferred stock if funds were available.↩