# GEO. D. LEDGERWOOD v. STATE.

No. A-585. Opinion Filed June 20, 1911.

(116 Pac. 202.)

1. **LARCENY—Evidence—Sufficiency.** For facts fully sustaining a conviction for grand larceny, see opinion.

2. **APPEAL AND ERROR—Presenting and Reserving in Lower Court Grounds of Review.** Errors occurring during the trial cannot be considered by this court unless they were incorporated in the motion for a new trial, and thereby submitted to the trial court, and its ruling thereon excepted to, and afterwards assigned for error in this court.

(Syllabus by the Court.)

*Appeal from Comanche County Court; J. R. Tolbert, Special Judge.*

George D. Ledgerwood was convicted of grand larceny, and appeals. Affirmed.

*Al Jennings,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., and *J. A. Fain,* County Atty., for the State.

FURMAN, P. J. This case was submitted on oral argument on behalf of the state and a brief on behalf of appellant. Only two questions are presented in the brief. Therefore the other assignments of error are waived.

First. The first question presented in the brief challenges the sufficiency of the testimony to support the conviction. The first witness for the state was Dewitt Eddins. He testified: That he was 20 years old, and that at the time of the commission of this offense he lived north of Cornish, in the Indian Territory, and that he was a farmer by occupation. That about 4 or 5 o'clock on the afternoon of November 9, 1907, he arrived in the city of Lawton, in the territory of Oklahoma. That he had been picking cotton over near Chattanooga, and that he was on his way to the home of his brother, A. A. Eddins, who lived five miles north of Hastings. That he reached Lawton on the

Rock Island train, and got off at the depot, and began to look around for a place to put his suit case until the train would come that night. That he finally went into the Monarch saloon, and asked the bartender if he could leave his suit case there, and the bartender said, "Yes; put it behind the office." That he then went on the street, and hung around a window watching his suit case for a while, and then went to a barber shop and got a shave and hair cut. That about 7:30 he returned to the Monarch saloon and got his suit case and carried it to the depot. He then found the train was 40 minutes late; that he came back to the Monarch saloon. That he was around there three or four minutes, when a man whom he did not then know, but has since found out to be Bud Grimes, walked up and caught him by the arm, and said, "How much money have you got?" The witness first denied having any money. Grimes replied, "You have got some money. How much have you got?" The witness replied that he had about 50 cents. Grimes then said, "You have got more money than that, and you are under arrest for the crime you have done." Grimes further said, "I will have to take you to jail. Come on." The witness then thought that he was under arrest, and went with Grimes into the Monarch saloon. The witness stopped, and Grimes said, "Come on, come on," and Grimes said that he hated to have witness under arrest, but that it was his duty, and further said that he would have to take witness in and search witness before he took him to jail, and that it was about one-half mile up to the courthouse, and Grimes took him into George Ledgerwood's saloon into a small room where he made witness sit down. Grimes then walked to a door, and said, "Come here, Bob, here is a fellow we have got for the rape up close to Amarillo," and appellant then came back to where they were, and said, "Yes; this is the lad. The description is all right." Grimes then had the witness sit down, and made the witness hold up his hands while he went through the pockets of the witness and took out $3.50 in silver and some change. Grimes then asked the witness if that was all the money he had, saying that, if he had more money, he would have to give it up;

.that, if he carried money with him to the jail, it would go much harder with him. .That witness then told Grimes he had $15 more in his shoes. That Grimes told witness to take off his .shoes, and give him the $15 referred to. That Grimes had everything written down on a large envelope he had taken from the witness. That witness then asked what they were going to do with his money. That the appellant then said: "I have .$15 in currency and $3.50 in silver. It will all have to go into court." That after a while Grimes said that he was a marshal from Waurika, and that he had to go there that night. He there-fore did not have time to take the witness to jail. That Ledgerwood then told the witness he would have to take him to jail. That witness objected to going to jail. That the appellant then called the witness out around the corner at the south door, and says, "I'll give you the money to get to where you want to go, and, if you want to get away from that man, you had better do so." Witness replied, "I have not done anything," and walked back into the room, and Grimes walked into the room, and says, "I have thought the matter over, and I guess I will have to take you to jail." The witness replied that he had four brothers and an old mother, and it would break her heart for him to be put in jail. That Grimes then asked the witness if he could make bond. Witness replied in the affirmative, and Grimes said it would have to be a $25,000 bond. That they sat there for some time. That witness and Grimes then went over to the depot. That Grimes said to the witness, "I don't want them to know you are under arrest, and I will give you the money to buy your ticket." Witness replied that he would not do so. That Grimes then informed the witness that the ticket office was closed, and they could pay their fare when they got on the train. That the witness then got his suit case, and Grimes then insisted on the witness taking $2. That witness entered the train in front of Grimes. That Grimes then placed witness in a seat in the car, and told him not to move. That Grimes then informed the witness that he had to go into another car and see a fellow. That after the train had gone three or four miles and the conductor

came through he asked the conductor where the marshal was, and the conductor replied that he was back in another car. Thereupon Mr. Patterson, a deputy sheriff, came to where the witness was, and carried the witness to his home in Walters that night, and they came back the next morning at Patterson's request. All this occurred in Comanche county, Okla. That when his money was taken from him witness believed that he was under arrest, and thought that Grimes and Ledgerwood had the right to take the money from him. That witness was only a boy, and did not know anything about the law and courts. That witness never got any of his money back. That the money was taken without his consent.

John Dossett testified on behalf of the state that at the time of the commission of this offense he was deputy sheriff of Comanche county, Okla.; that he was acquainted with both Bud Grimes and the appellant, George Ledgerwood; that on the night when the witness Eddins claimed he had been robbed he saw Bud Grimes and Eddins about half way between the theater and appellant's saloon; that they were going west; that afterwards he saw said parties, Bud Grimes and Eddins, down at the depot when they got on the train about five minutes before the train started.

Claude Small, a witness for the state, testified that on the night in question he saw Bud Grimes and the witness Eddins at the Rock Island depot get on the car.

J. H. Patterson testified on behalf of the state that he was deputy sheriff of Comanche county, Okla.; that he was acquainted with appellant; that on the night of November 9, 1907, he saw the witness Eddins and Bud Grimes going from the Monarch Theater in a westerly direction; that the Monarch Theater was four or five doors east of the saloon of appellant; that afterwards he saw Bud Grimes and the witness Eddins get on the train going south; that witness was on the same train; that Eddins related to the witness what had taken place, and the witness carried Eddins to his home in Walters that night. Thereupon the state rested.

Appellant, Ledgerwood, placed a number of witnesses on the stand who testified to facts which, if believed by the jury, would have established a complete alibi for him. Appellant took the stand as a witness in his own behalf, and denied the testimony on the part of the state connecting him with the commission of this offense. The testimony on behalf of the state, if believed by the jury, made a clear case against the appellant of grand larceny.

Section 2594 of Snyder's Compiled Laws of Oklahoma of 1909 is as follows:

"Grand larceny is larceny committed in either of the following cases: (1) When the property taken is of value exceeding twenty dollars. (2) When such property, although not of value exceeding twenty dollars in value, is taken from the person of another. Larceny in other cases is petit larceny."

The jury saw the witnesses and heard their testimony. Appellant had not exhausted all of his peremptory challenges. The jury was therefore satisfactory to him. It was their exclusive province to settle all questions as to the credibility of the witnesses and conflicts in the evidence, and they having accepted as true the testimony of the state, and as we see nothing in the record which would indicate that the jury was influenced by improper motives in convicting the appellant, we cannot disturb their verdict upon the ground that it is contrary to the testimony.

Second. Appellant in his brief complains of improper conduct and improper argument upon the part of counsel for the state in the trial of this case. We have carefully examined the record in this case, and find that appellant did not complain of such improper conduct in his motion for a new trial. Neither was such alleged conduct mentioned or assigned in the petition in error, by means of which this case was brought before this court. It is true that errors which go to the jurisdiction of the court to try a case may be raised for the first time in this court, or in fact at any time before the final completion of the judgment and sentence of the lower court. But, in order to bring before us on appeal errors of law alleged to have occurred during

the trial, they must be incorporated in the motion for a new trial, and thereby submitted to the determination of the trial court, and the action of the trial court thereon excepted to and then brought before us by proper assignments in the petition in error.

As we understand the law, the correct rule of procedure in matters of this kind is stated by Mr. Justice Kane of our Supreme Court in the case of *Stinchcomb v. Myers,* 28 Okla. 597, 115 Pac. 602, which is as follows:

"It has long been the settled rule of practice in this court that errors occurring during the trial cannot be considered by the Supreme Court, unless a motion for a new trial, founded upon and including such errors, has been made by the complaining party and acted upon by the trial court, and its ruling excepted to, and afterwards assigned for error in the Supreme Court. *Beall v. Mutual Life Ins. Co. of N. Y.,* 7 Okla. 285, 54 Pac. 474; *Glaser et al. v. Glaser et al.,* 13 Okla. 389, 74 Pac. 944; *Bradford v. Brennan et al.,* 15 Okla. 47, 78 Pac. 387."

We find no error in the record, and the judgment of the lower court is therefore in all things affirmed.

ARMSTRONG and DOYLE, JJ., concur.