**BLUE RIVER COMPANY, a Wyoming Corporation, Plaintiff,**

v.

**SUMMIT COUNTY DEVELOPMENT CORPORATION, a Colorado Corporation, Defendant.**

Civ. A. No. 7573.

United States District Court
D. Colorado.

July 6, 1962.

---

284

Lindner, Arkin & Davis, Attorneys at Law, Denver, Colo., for plaintiff.

Grant, Shafroth, Toll & McHendrie, Erl H. Ellis, Denver, Colo., for defendant.

DOYLE, Judge.

On May 25, 1962, an ex parte temporary restraining order was entered which enjoined defendant from sales, conveyances, or encumbrances of certain real property in Summit County, Colorado. Thereafter, on June 2, 5, and 6, a hearing was held on the plaintiff's motion for temporary injunction and the Court now finds and concludes the facts and law relating to this motion.

The Complaint alleges that on September 6, 1960, a "deed form supposedly from the Blue River Company was executed" purporting to convey certain property of the plaintiff corporation, including the Fanny Placer Mining Claim and the Maggie Placer Mining Claim reserving a ten per cent. royalty interest from all ores, metals or minerals produced or sold from the said placer claims.

It is further alleged that on or about October 31, 1960, a "deed form supposedly from the Blue River Company was executed" purporting to make a conveyance of all of the real property, placer mining claims, and other real estate owned by the Blue River Company located in Summit County, Colorado.

The Complaint further alleges that the mentioned deeds were unauthorized, invalid and ultra vires actions; that there was a lack of authority to make the conveyances and that this lack of authority was known, or should have been known, by the defendant, and that the defend-

ant received no title or interest on the deeds.

There are general allegations (but no factual explanation) that defendant conspired with the alleged officers of the plaintiff and was thus not a bona fide purchaser of the properties.

Damages are claimed in the sum of Ten Million Dollars and plaintiff has offered to return the consideration which was paid for the properties at the time of the execution of the deeds.

The present motion seeks an injunction restraining defendant from conveying, selling and encumbering the described real estate pending the trial of the case and alleges that the property is presently being sold, conveyed, and encumbered by the defendant. It alleges that the defendant's claim of title "is the result of unauthorized and fraudulent transaction, and a conspiracy which is the basis of this lawsuit and in which the defendant had a part." Permanent and irreparable damage will be suffered by plaintiff, according to the allegation, unless injunctive relief is granted.

The lands are located in Breckenridge, Colorado, an area which was formerly devoted to placer mining but which has in recent years experienced development for recreational purposes. Defendant has spent substantial sums in developing ski lifts, a lodge, restaurant, bowling alley, and other recreational facilities.

The negotiations leading to the conveyances in question were conducted by William J. Stark, first on his own account, and later on behalf of the defendant, and by Robert B. Russell, who then represented the plaintiff. As a result of these negotiations an option to buy this land was granted to Stark, who later assigned it to defendant and this provided for the purchase for the total sum of $45,000.00 of the defendant's land in Summit County on a piecemeal basis over a period of twenty years. The sum of $1,000.00 was paid for the option which was signed by Russell as "Chairman of the Board" and "As Owner or Representative of All of the Outstanding Stock." The check for $1,000.00 was given to Russell as agent for Blue River Company.

It is to be noted that at the time of the giving of the option plaintiff company was more or less defunct. It had no cash in its treasury and had substantial obligations, and following the granting of the option on February 5, 1960, Russell wrote to the creditors of the plaintiff corporation explaining that he had given the option and that he might realize something from it. He suggested a plan for division of the money by the creditors and the stockholders. This proposed compromise plan (whereby creditors would receive less than the amount owing) was later accepted. However, after the giving of this option there were further negotiations which terminated in the sale of not only the Fanny and Maggie Placer Mining Claims, but also the remaining property of plaintiff located in Summit County. This was for a cash price of $25,000.00.

Both the negotiations and the intracorporate procedures followed by Blue River Company were informal. Russell represented himself to defendant as representing all of the stock of the company and proceeded in his dealings and in the various corporate meetings on that basis. He had come into this position as the son-in-law of Mrs. Erland F. (Mildred) Fish, whose husband had owned most of the stock of this corporation during his life time. Russell himself owned 10,000 shares, whereas the Fish Estate owned 399,029 shares, leaving 5 qualifying shares outstanding. Apparently, the Will of Erland F. Fish provided for the transfer of his 399,029 shares to a testamentary trust. Mrs. Fish was one of the trustees and Merchants National Bank of Boston, Massachusetts, was the other trustee under the Will of Erland F. Fish. Russell's authority to represent the Fish shares derived from an agreement with Mrs. Fish which was executed December 9, 1957 (long before the present negotiations). The bank wrote a letter dated October 28, 1958 in which it approved the terms of Russell's agency. The agreement between Mrs. Fish and Russell au-

thorized Russell to represent the interest of the Fish Estate in negotiations designed to realize some cash from the 399,029 shares of stock. Recitations show this contract to have been entered into because of the necessity to raise cash so as to pay ad valorem real estate taxes and other obligations and because of the impossibility of advancing trust moneys for this purpose, and so as to realize something from the shares. (They had been treated as valueless in the estate.)

The various corporate minutes have been introduced and they reveal that several meetings were held concerning the sale of the lands in question. Some of these were called as shareholder meetings and some were meetings of the Board of Directors and the failure of the plaintiff corporation to strictly conform to the requirements of law in the matter of issuing shares on the books of the company, in giving notices, together with questions of the eligibility of officers to act as such, constitute the basis for the present suit which seeks in essence to cancel or rescind the deeds.

A factor which plaintiff emphasizes is the failure to formally issue shares to the trustees of the Fish Trust as a basis for contending that Russell lacked authority. These shares stood in the name of Erland Fish, although it is conceded that the trust was entitled to have them and subsequently there was a formal issuance of them.

A shareholders' meeting was held on October 23, 1959, and there was present at this meeting, according to the minutes, Robert B. Russell in the interest of his 10,000 shares and also as representative of the Erland F. Fish Estate and its 399,029 shares. Others present were Donald M. Hill and Donald M. Hill, Jr., each of whom owned one share. At that meeting Donald M. Hill, Jr., Russell and Nicholas A. Pandiscio were elected directors.

On February 8, 1960 (after the giving of the option to Stark), a directors' meeting attended by Russell and Pandiscio, was held. The by laws were amended to increase the Board from three to five members. Following this a shareholders' meeting was held and it appears from the minutes that the Russell and Fish shares were regarded as the entire outstanding stock of the corporation. The shareholders approved the Russell agency from Mrs. Fish which granted to Russell a one-third commission of all amounts recovered up to $20,000.00 and fifty per cent. of recoveries in excess of that figure. The directors named Russell Chairman of the Board, Chittick was elected President, Pandiscio, Vice President, and Pauline F. Gray, Secretary-Treasurer.

The next meeting was a joint one of both shareholders and board members and this occurred on November 21, 1960. The minutes of that meeting reveal that Russell stated that he had notified the directors that he held one share in trust for each of them; that on that occasion Pandiscio resigned as a director, was notified that his qualifying share had been withdrawn and Russell's son, Charles B. Russell, was named director. Russell stated that he was then holding a qualifying share of stock for the boy.

There are two other noteworthy meetings which are shown in the minutes. One occurred on July 16, 1961 and was a joint meeting of the stockholders and directors. This concerned the proposed sale of the shares of stock of the corporation to John T. Collins for $40,000.00. The other meeting was held on November 15, 1961, and was also a joint meeting of shareholders and directors. The minutes of this meeting showed that Russell was representing the entire outstanding stock with the exception of five shares and the actions of Russell in connection with the sales of land to the defendant were formally ratified as were the actions of the officers in making the conveyances.

The original option was later abandoned in favor of immediate sale of the property for $25,000.00. The $25,000.00 –sale price was paid by defendant to plaintiff in the form of two checks, one of these in the amount of $10,000.00 was made payable to Robert B. Russell, as payee, and the second in the amount of

$15,000.00 was to plaintiff corporation. Following the giving of the deeds and the receipt of the $25,000.00 Russell made distribution of the sums received and also of the $1,000.00 which had been paid to him at the time of the giving of the original option. These sums went to Russell for commissions, to creditors to repay advances which had been given for taxes and legal fees, and part of it was distributed to the shareholders. This distribution occurred in January, 1961, and after this the Fish and Russell stock was sold to the individuals who now control the plaintiff corporation.

Plaintiff has also stressed the fact that at the time of the deeding of the property in question the plaintiff corporation had leased the Fanny and Maggie Placers. The lessee had assigned this lease and the assignee was at the time of the deeds in possession of the property. Little, if any, mining was then going on however, and the lease was kept barely alive by payment of the basic rental. Apparently, Russell evidenced a willingness to terminate this lease and the defendant was, of course, anxious to gain possession of the property so as to prevent further mining operations. The effect of this, of course, would be to deprive the plaintiff of the rentals and this attitude of Russell, that is, his willingness to terminate this lease (as part of the sale) in cooperation with defendant, is relied on by the plaintiff as indicating a willingness on the part of Russell to act contrary to the best interests of the plaintiff company.

One other fact which should be noted is that on February 10, 1960, Russell notified Mr. Ellis, who was then attorney for Stark and who later became attorney for defendant, that from that date forward all dealings of defendant with Blue River were to be through him as agent. He also directed that payments be made to him personally as the $1,000.00 which was made at the time of the execution of the lease was made to him. He added: "This way of doing it was understood when I agreed to take over handling the stock of the company and has now been formally approved by the company."

Essentially, the action is one in cancellation or rescission and the basis for the request for relief can be summarized as follows:

Plaintiff's exact contentions are difficult to glean from the brief, but from what appears it would seem that plaintiff contends the following:

*First,* that the deeds did not confer title on defendant and that they should be set aside because the purported conveyances were ultra vires and void (not voidable). Complaint is made that Mildred R. Fish (Mrs. Erland F. Fish) did not have the consent of her co-trustee, the Merchants National Bank, at the time that she appointed Russell as agent; moreover, the stock which stood in the name of Erland F. Fish was not formally transferred to the trustees, Mrs. Fish and the bank, so that at the time that Russell was acting the stock actually stood in the name of Erland F. Fish, whereas Russell's authority came from Mildred R. Fish as trustee.

*Secondly,* it is contended that there was a failure to follow the by-laws of the corporation and the statutes of Wyoming, the place of incorporation of the Blue River Company, in that formal notices of meetings of stockholders were not shown to have been given. It is said that at the meeting of February 8, 1960 the minutes reflected that due notice was given to the stockholders but that no such notice was exhibited. This would refer to the five qualifying shares only since the other 409,029 shares were present through Russell.

*Thirdly,* it is contended that the persons elected to the Board of Directors were all associates of Russell, and that the directors and officers were not shown to have had stock issued to them as required by the corporation laws of Wyoming. A further point is that Russell did not have an effective proxy so as to authorize him to vote the Fish stock for the purpose of selling the assets of the corporation and that if the agency agreement between Mrs. Fish and Mr. Russell is relied on it could not serve as a proxy

because of its having lapsed (within the terms of the Wyoming statute). It is also pointed out that in the deed executed September 6, 1960, although the signature of Robert B. Russell as Chairman of the Board of Directors was acknowledged, there appears no statement as to when the Notary Public's commission expired; on this, it is said that there is no affirmative showing that these signatures were acknowledged by a Notary Public then authorized according to law.

*Finally,* it is said that the Wyoming statutes do not authorize, nor do the corporation's by-laws authorize the Chairman of the Board to sign a deed conveying the corporate property.

From an analysis of the plaintiff's contentions it is apparent that there is no evidence to establish that the Blue River Company was the victim of fraud, actual or constructive, as alleged in the complaint and in the motion for a temporary injunction. The corporation was not misled and the actions taken were not contrary to the wishes of the then shareholders. There has been no evidence establishing that this transaction was anything other than an arm's length one between an all-but-defunct mining company which was suffering loss of its real estate through tax sales and desirous of salvaging something, and a development company engaged in the acquisition of this together with many other properties in the area (a total in excess of 5,000 acres). There is no evidence of overreaching, of gross inadequacy of consideration, of failure to disclose the facts to persons interested, or of other conduct establishing fraud of even a constructive nature. In the final analysis, plaintiff's case reduces itself to an effort to cancel or rescind wholly upon the basis of intracorporate formal and procedural deficiencies leading up to the execution of the deeds in question and some deficiencies in the execution of the said deeds (e. g., the Notary deficiency and the execution of one of the deeds by the Chairman of the Board rather than the President). So, the plaintiff can succeed in its present effort to obtain a preliminary injunction only by establishing that such irregularities as it has been able to show furnish a basis for cancellation by the grantor of executed deeds.

The basic question for determination here is, therefore, whether the informal methods employed by the plaintiff in negotiating and selling this land, even though full disclosure was made to interested shareholders, can now constitute a basis for cancellation or rescission of the executed deeds upon the demand of the grantor, it appearing that the stock has been sold to third persons who have now assumed management of the plaintiff corporation and who of course now disapprove the transactions, and it also appearing that defendant has expended substantial sums of money in development which has undoubtedly increased the value of these lands.

## I.

■■ It is axiomatic that in order to justify the grant of temporary injunctive relief (a drastic remedy), the plaintiff must establish his basic right to the level of probability. See 28 Am.Jur. 502, 503, § 14 Injunctions, and 28 Am.Jur. 789, 790, where it is said:

"* * * Ordinarily the court in its discretion may grant the injunction where it appears that there is a substantial question to be tried, that the case is clear and free from doubt, and that the defendant is threatening the immediate commission of an act which will cause irreparable injury or destroy the status quo before a full hearing can be had on the merits of the case. The court exercises its discretion upon the basis of a series of estimates: the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury alleged flowing from denial of preliminary relief, the balancing of damage and convenience generally, *and the probability of the ultimate success or failure of the suit.* Injunction is properly granted where

it appears that the plaintiff's ultimate success in the case is certain or reasonably probable, and that a continuation by the defendant of the acts complained of until the final hearing will work substantial and irreparable injury to the plaintiff. Conversely, such relief will be denied if the court is convinced with reasonable certainty that the complainant will not succeed at the final hearing." (Emphasis supplied.)

It is unnecessary in this case to balance the various equitable considerations which normally attend the granting or withholding of injunctive relief. The controlling issue here is whether plaintiff has made a sufficient impact on the merits, i. e., in showing a probability of ultimate recovery to justify the granting of the relief, and this analysis will be thus limited.

## II.

In urging that a fatal defect in the conveyance arises from the fact that there was no formal transfer of the Fish shares, plaintiff overlooks the fact that Mrs. Fish and the Merchants Bank were at all times entitled to the shares. They thus owned them in equity and were entitled to exercise rights granted to shareholders notwithstanding there had been no formal transfer. The Court of Appeals for the second circuit expressed this fundamental principle in In re Algonquin Electric Co., 61 F.2d 779 (per Judge Augustus Hand), as follows:

"* * * It is argued that these conveyances were void because they were not consented to by the 'holders of record * * * entitled to vote thereon' of the outstanding shares of the grantor corporations, as required by section 20 of the New York Stock Corporation Law (Consol. Laws, c. 59). Leo Potter Incorporated was the beneficial owner of all the stock of the grantor, and voted in favor of the transfer. Though the transfers of stock to it on the books were not completed

until some time in the month of February, 1927, because of its ownership of the beneficial interest, no one was prejudiced by this irregularity in the January conveyance of assets, and the subsequent transfers of stock validated the conveyances as of the dates when they took place."

There are numerous decisions which recognize that the issuance of stock to persons who are entitled to it is a formality and that the certificate is in any event an evidence. Pacific National Bank of Boston v. Eaton, 141 U.S. 227, 11 S. Ct. 984, 35 L.Ed. 702. Here the stock had been subscribed and issued but had not been delivered. Continental Securities v. Interborough Rapid Transfer Co., 165 F. 945, (Circuit Court, S.D.N.Y.). Here it was said:

"* * * The certificates of stock ownership are not the stock itself or the shares of the capital itself, but mere evidence of ownership of so many shares of the money put in the business as capital stock. * * *"

The Court of Appeals has also expressed this identical philosophy in Howbert v. Penrose, 38 F.2d 577, 579, 68 A. L.R. 820, (then Cir. 8):

"* * * That certificates of stock are but evidence of ownership, and that the ownership follows the owner, and not the certificates, is still a settled principle of our law"

If the property in the shares in the case at bar was not in the trustees it was non-existent. And yet, it was not with the deceased, nor in a state of suspended animation, and so it had to be in the trustees; otherwise, the corporation could not have functioned. And so, while the method employed was not in strict compliance with the law, it is difficult to see how the plaintiff corporation can complain that this stock was impotent for lack of certificates. Only the trustees could be affected and their complaint would be limited to abuse of agency and even they could not claim injury on account of failure to issue a certificate.

## III.

It is broadly asserted by plaintiff that the deeds in the case at bar were *ultra vires* acts of the purported officers of the plaintiff corporation. As indicated above, this allegation stems from the procedural deficiencies which have been described. It must be observed at the outset of this inquiry that this is an incorrect characterization. It is, according to Fletcher, Cyclopedia of Corporations (7 Fletcher, supra, 561, § 3399), the exercise of a power which is not within the express or implied powers of the corporation as fixed by its charter, the statutes, or the common law. The author goes on to add:

"* * * Strictly speaking, they are 'contracts not positively forbidden, but impliedly forbidden, because not expressly or impliedly authorized.' * * *"

The author further explains (7 Fletcher, supra, § 3402):

"Another class of corporate contracts which are sometimes said to be ultra vires, although the phrase as applied to them is inaccurate, is where the power exists to do what was done, provided the corporation does it in a certain prescribed way. In other words, the irregular exercise of an unquestioned power of the corporation is not ultra vires. Thus, informalities in connection with the consent of stockholders to the contract are often incorrectly referred to as ultra vires, using the term in its strict sense. The fact that the required consent of stockholders is not obtained does not make a contract ultra vires. * * *"

■ In the case at bar it is clear that the complained of deficiencies are of the kind described above and are not strictly speaking ultra vires. But even if the alleged deficiencies which are under scrutiny here are considered as *"ultra vires"*, the plaintiff is thwarted by the fact that this is an *executed* conveyance and plaintiff is in no better position to demand a rescission than it would have been under the prior regime—that which actually made the conveyance. The principle which governs attempted rescission of conveyances is also expressed by Fletcher, Section 3517, as follows:

"Considering the effect of ultra vires conveyances, viewed simply as transfers of property, apart from any covenants therein, it is well settled that an ultra vires conveyance of real property by a corporation, or an ultra vires transfer of personal property, including notes and other choses in action, like a conveyance or transfer to a corporation in excess of its powers, is not absolutely void, but passes the title, and third persons cannot urge ultra vires. *The corporation cannot maintain a suit to rescind and to recover the property.*" (Emphasis supplied.)

Illustrative cases denying cancellation or rescission, even though the transfer was ultra vires where the contract or conveyance had been executed, are numerous. This list includes: St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U.S. 393, 12 S.Ct. 953, 36 L.Ed. 748; Savings & Trust Co. of Cleveland, Ohio v. Bear Valley Irr. Co., C.C., 112 F. 693; Bear Valley Land & Water Co. v. Savings & Trust Co., C.C., 117 F. 941; Metcalf v. American School Furniture Co., C.C., 122 F. 115; Memphis Lumber Co. v. Security Bank & Trust Co., 143 Tenn. 136, 226 S.W. 182; Linker & Herbert, Inc. v. Marshall, D.C., 133 F.Supp. 148 (a stockholder's derivative action); Thomas v. West Jersey R. R. Co., 101 U.S. 71, 25 L.Ed. 950, (an executory contract—here the Court distinguished the executed contract situation); Hitchcock v. Galveston, 96 U.S. 341, 24 L.Ed. 659; Taylor v. S. & N. Alabama R. Co., (Circuit Court, M. D.Ala.) 13 F. 152 (a shareholder's suit which turned on the fact that the transaction was executed and also on the proposition of laches). Various reasons are cited in these cases for refusal to disturb executed transactions. Some of the cases turn on the fact that the grantor and grantee are in *pari delicto*; others speak of estoppel or laches, and in other cases it is said that the corporation will not be

allowed to take advantage of its own wrongdoing, and that the right of action, if any, belongs to the shareholder who is aggrieved.

Thus, in St. Louis V. & T. H. R. Co., supra, the Court denied a remedy in rescission on the ground of refusal of the Court to lend its aid to a wrongdoer. The distinction between an executory and executed contract is well explained by the Supreme Court as follows:

"While an unlawful contract, the parties to which are *in pari delicto,* remains executory, its invalidity is a defence in a court of law; and a court of equity will order its cancellation only as an equitable mode of making that defence effectual, and when necessary for that purpose. Adamson Eq. 175. Consequently, it is well settled, at the present day, that a court of equity will not entertain jurisdiction to order an instrument to be delivered up and cancelled, upon the ground of illegality appearing on its face, and when, therefore, there is no danger that the lapse of time may deprive the party to be charged upon it of his means of defence. Story, Eq.Jur. § 700a, and cases cited; Simpson v. Howden, 3 Myl. & Cr. 97; Ayerst v. Jenkins, L.R. 16 Eq. 275, 282.

"When the parties are *in pari delicto,* and the contract has been fully executed on the part of the plaintiff, by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract. Thomas v. Richmond, above cited; Ayerst v. Jenkins, L.R. 16 Eq. 275, 284. For instance, property conveyed pursuant to a contract made in consideration of the compounding of a crime, and the stifling of a criminal prosecution, and therefore clearly illegal, cannot be recovered back at law, nor the conveyance set aside in equity, unless obtained by such fraud or oppression on the part of the grantee, that the conveyance cannot be considered the voluntary act of the grantor. Worcester v. Eaton, 11 Mass. 368, and 13 Mass. 371; Atwood v. Fisk, 101 Mass. 363; Bryant v. Peck & Whipple Co., 154 Mass. 460 [28 N.E. 678]; Williams v. Bayley, L.R. 1 H.L. 200; Jones v. Merionethshire Society, 1892, 1 Ch. 173, 182, 185, 187."

In Metcalf, supra, the Court denied the right of a minority shareholder to invoke a cancellation of an executed sale of all of the property of the corporation where a majority of the shareholders had ratified the sale and the transaction was executed. Here the Court said:

"In referring next to the actual transfer and its effect, it must not be overlooked that this was an executed contract. The pleas in bar allege that all prior transactions leading to a sale of the property and a dissolution of the corporation were ratified by a positive majority of the stockholders on March 2, 1899. Having in mind the legal distinction between the right which the corporation possesses to rescind a contract on account of fraud and by reason of acts claimed to be ultra vires, how can it be insisted that the solemn contract made between the Buffalo Company and the American Company should be set aside, after it had become executed, in obedience to the behest of the complainant? Her right, as heretofore stated, is not enlarged beyond that of the corporation. Her status is accordingly narrow and circumscribed. Title to property and its possession having passed to the grantee, the corporation is estopped from seeking a rescission of its contract. A stockholder standing in the shoes of the corporation likewise is estopped from asserting the invalidity of such an act. * * * "

In Linker & Herbert, Inc., supra, a more recent case, the District Court for

the Eastern District of Wisconsin, in dealing with an attempted stockholder rescission of a transfer by officers and directors, said:

> "The Wisconsin Supreme Court frowns upon rescinding executed transactions where Section 182.011 has been violated:
>
> " 'The whole trend of modern decisions is against impeachment of executed corporate transactions except by punishment of the corporation at the suit of the state.' Marvin v. Anderson [111 Wis. 387, 87 N.W. 226], supra.
>
> "Even where a transaction is *ultra vires*, the Wisconsin Court held that the executed contract must stand:
>
> " ' "An *ultra vires* contract, one not within the scope of the corporate authority to make under any circumstances, which is no longer executory and is not tainted by fraud, or clearly prohibited by statute, or condemned by sound public policy, cannot be impeached by the corporation or any one representing it." ' Kanneberg v. Evangelical Creed Congregation, 146 Wis. 610, 617, 131 N.W. 353, 355, 39 L.R.A.,N.S., 138."

■ Without quoting from and discussing all of the cases cited above, it can be concluded that the rule of no cancellation of executed transactions is firm and well settled. The basic reason for the refusal would appear to be not only the difficulties of divesting rights but also a high degree of inequity—the punishing of the grantee for the wrongdoing of the very one demanding the relief. It is also clear that if a cancellation of a true ultra vires transaction will not be granted, *a fortiori* relief will not be granted where the claim arises from alleged irregularity or procedural deficiency.

The Supreme Court of Colorado has denied relief of the kind here under discussion to a creditor in Gallup v. Pring, 108 Colo. 277, 116 P. 202, and in Dillon v. Myers, 58 Colo. 492, 146 P. 268. The complaints here involved irregularities

and the holding was that the aggrieved shareholder was the proper party.

## IV.

■ A final question which has been emphasized and which deserves comment is whether the failure to comply with the notice provisions for shareholder meetings provided by the Wyoming statute is a fatal defect. See 5 Wyoming Stat., Sec. 17–12. Fletcher on Corporations, vol. 7, § 3012, points out that such a defect gives no right to the corporation—that the right, if any, is in the ignored stockholder. As in the ultra vires situation, a distinction is made between executory and executed contracts, and it is said that courts will sometimes refuse to enforce such contracts as void. However, the author adds:

> "On the other hand, statutes providing that corporations shall not engage in certain transactions or enter into certain contracts without the consent of the stockholders and that if they do their acts will be 'void,' have been construed as meaning voidable, so as to be capable of ratification by acts or silence of the persons for whose benefit the statute was enacted, i. e., the stockholders, on the theory that an act declared to be void by statute which is malum in se or against public policy is utterly void and incapable of ratification, but an act or contract which is neither wrong in itself nor against public policy, but which has been declared void for the protection or benefit of a certain party or class of parties, is voidable only, and is capable of ratification by the act or silence of the beneficiary or beneficiaries."

No provision of the Wyoming statute as it existed in September and October, 1960, declares consequences of failure to properly notify stockholders and it would appear that these notice provisions are directory and cannot furnish a basis for an action like the present one.

Other points have been raised and the Court has considered them individually

and in their total effect, and has also evaluated the total effect of all of plaintiff's contentions. The Court's opinion is that plaintiff has failed to demonstrate a probability of violation of its rights by defendant whereby there exists a likelihood of ultimate recovery.

Being of the opinion that the plaintiff's case is also lacking in fundamental equities, it follows that the motion for preliminary injunction must be denied. It is, therefore,

Ordered and decreed that plaintiff's motion for temporary injunction be, and the same is hereby denied.